**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gary E. CHESNEY, Defendant–Appellant.**

No. 95–5203.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 8, 1995.

Decided June 14, 1996.

Hugh B. Ward, Jr. (argued and briefed), Office of U.S. Atty., Knoxville, TN, for plaintiff-appellee.

Leah J. Prewitt (argued and briefed), Federal Defender Services, Knoxville, TN, for defendant-appellant.

Before CONTIE, BATCHELDER, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which CONTIE, J., joined.

BATCHELDER, J. (pp. 574–82), delivered a separate opinion concurring in all parts of the majority's opinion and in the results of Parts II.B and II.C.

MOORE, Circuit Judge.

Defendant–Appellant Gary E. Chesney appeals his conviction and sentence for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e). We find no merit in Chesney's assignments of error and affirm.

## I

On June 5, 1992, two men robbed Jerome Wingfield at gunpoint. One of the robbers beat Wingfield about the body with a gun, which Wingfield described as a chrome-plated .38 or .357 revolver. Wingfield shot at the robbers, who shot back, but the robbers escaped. Wingfield described the robbers to police, who identified the robbers as Chesney and Ricky Golden.

On June 10, 1992, Ann Myers ("Myers"), Chesney's state probation officer, informed the Knoxville police that Chesney was at her office. When the Knoxville police officers arrived at Myers's office, Myers told them that Chesney had left in a 1980 Pontiac Bonneville. The Knoxville police stopped the automobile that Myers had described. Chesney was a passenger in the automobile, which Golden was driving. The Knoxville police officers searched the vehicle and found a .357 revolver among Chesney's state prison clothes in the trunk of the car. The car belonged to Chesney's girlfriend.

Chesney was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Chesney stipulated that he had been convicted of a felony, and that the firearm was a .357 magnum revolver that was not manufactured in Tennessee and had been shipped or transported in interstate commerce. Chesney was found guilty after a two-day jury trial, and was sentenced to 262 months of incarceration and five years of supervised release.

Chesney raises five issues on appeal. First, Chesney argues that § 922(g)(1) is unconstitutional because it allegedly exceeds Congress's power under the Commerce Clause and because the government failed to prove a substantial nexus between the crime charged and interstate commerce. Second, Chesney claims that the district court erred by admitting evidence about the June 5 robbery of Wingfield. Third, Chesney argues that the district court erred by instructing the jury on joint possession. Fourth, Chesney argues that his proposed jury instruction on credibility of witnesses should have been given by the court. Finally, Chesney asserts that he should have been permitted to argue to the jury about the punishment he would receive if convicted.

## II

Section 922(g)(1) provides:

It shall be unlawful for any person ... who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Chesney claims that the Supreme Court's decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), requires us to invalidate his conviction pursuant to § 922(g)(1) because he claims that § 922(g)(1) is beyond Congress's Commerce Clause powers, and because the government failed to prove that Chesney's possession of this particular gun had a substantial effect on interstate commerce. Chesney thus appears to challenge the statute both on its face and as applied to him.

## A

■ Chesney did not raise the issue of the constitutionality of § 922(g)(1) below. Normally, such a waiver would preclude our consideration of the issue on appeal. *Foster v. Barilow,* 6 F.3d 405, 407 (6th Cir.1993). However, we may exercise our discretion to review an issue not raised below in " 'exceptional cases or particular circumstances,' " or "when the rule would produce 'a plain mis-

carriage of justice.'" *Id.* (quoting *Pinney Dock & Transport Co. v. Penn Central Corp.,* 838 F.2d 1445, 1461 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988)).

■ We find that such exceptional circumstances exist here because the *Lopez* case was decided after the district court entered judgment in this case. Thus, Chesney's *Lopez* challenge to § 922(g)(1) was not available below. Moreover, the constitutionality of § 922(g)(1) is purely a legal question that has been briefed fully by both parties. *United States v. Real Property Known & Numbered As 429 South Main Street, New Lexington, Ohio,* 52 F.3d 1416, 1419 (6th Cir.1995) ("Although [claimant] did not raise this issue below, we address it on appeal, because the question presents a purely legal issue not available to [claimant] below.... In addition, both parties have briefed the issue.").

**B**

Since the submission of Chesney's appeal to this panel, another panel of this court has held § 922(g)(1) to be constitutional. In *United States v. Turner,* 77 F.3d 887 (6th Cir.1996), a unanimous panel held that "§ 922(g)(1) represents a valid exercise of legislative power under the Commerce Clause." *Id.* at 889. As this court wrote in *Turner,* "Every court of appeals that has been faced with this question since *Lopez* has held that the jurisdictional element of § 922(g) provides the requisite nexus with interstate commerce that § 922(q) lacked." *Id.* (citing *United States v. Sorrentino,* 72 F.3d 294, 296 (2d Cir.1995); *United States v. Hinton,* No. 95–5095, 1995 WL 623876, at *2 (4th Cir. Oct. 25, 1995) (per curiam) (unpublished), *cert. denied,* —— U.S. ——, 116 S.Ct. 1026, 134 L.Ed.2d 104 (1996); *United States v. Lee,* 72 F.3d 55, 58 (7th Cir.1995); *United States v. Shelton,* 66 F.3d 991, 992–93 (8th Cir.1995) (per curiam), *cert. denied,* —— U.S. ——, 116 S.Ct. 1364, 134 L.Ed.2d 530 (1996); *United States v. Collins,* 61 F.3d 1379, 1383–84 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995); *United States v. Bolton,* 68 F.3d 396, 400 (10th Cir.

1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996)). *See also United States v. Gateward,* 84 F.3d 670, 672 (3d Cir.1996); *United States v. Bradford,* 78 F.3d 1216, 1223 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1581, —— L.Ed.2d —— (1996); *United States v. Bates,* 77 F.3d 1101, 1104 (8th Cir.1996); *United States v. McAllister,* 77 F.3d 387, 389–90 (11th Cir.1996); *United States v. Bennett,* 75 F.3d 40, 48–49 (1st Cir.1996); *United States v. Bell,* 70 F.3d 495, 497–98 (7th Cir.1995); *United States v. Rankin,* 64 F.3d 338, 339 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 577, 133 L.Ed.2d 500 (1995); *United States v. Hanna,* 55 F.3d 1456, 1461–62 (9th Cir.1995). Thus, all ten courts of appeals that have considered the constitutionality of § 922(g)(1) since *Lopez* have upheld the statute.

■ Courts uniformly have rejected facial challenges to § 922(g)(1) because § 922(g)(1) contains a jurisdictional provision that requires the government to prove that the firearm was possessed "in or affecting commerce." *E.g., Turner,* 77 F.3d at 889 ("Requiring the government in each case to prove that a felon has possessed a firearm 'in or affecting commerce' ensures that the firearm possession in question affects interstate commerce and saves § 922(g) from the jurisdictional defect that doomed § 922(q) [the statute invalidated in *Lopez* ]"); *McAllister,* 77 F.3d at 389–90 ("This jurisdictional element defeats McAllister's facial challenge to the constitutionality of § 922(g)(1)."); *Bell,* 70 F.3d at 498 ("Section 922(g)(1) does not suffer from the same infirmities [as § 922(q) ]. It contains an explicit requirement that a nexus to interstate commerce be established."); *Hanna,* 55 F.3d at 1462 n. 2 ("Section 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its constitutionality under the Commerce Clause."); *Bolton,* 68 F.3d at 400 (same). We agree with these courts that the presence of the jurisdictional element defeats Chesney's facial challenge to § 922(g)(1), particularly in light of the *Lopez* Court's approval of former 18 U.S.C. § 1202(a),[1] as interpreted in *Unit-*

---

**1.** Section 1202(a) read:

Any person who ... has been convicted by a court of the United States or of a State or any

ed States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

18 U.S.C. § 1202(a) is the predecessor statute to § 922(g)(1), the provision Chesney challenges here. In *Lopez*, the Supreme Court held that 18 U.S.C. § 922(q), the Gun–Free School Zones Act, was unconstitutional because it was beyond the scope of Congress's Commerce Clause power. —— U.S. at ——, 115 S.Ct. at 1626. As one of its reasons for holding § 922(q) unconstitutional, the Court stated:

> Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.... Unlike the statute in *Bass* [§ 1202(a) ], § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

*Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. As this court held in *Turner*, § 922(g)(1) contains just such a jurisdictional element, and the government is required to prove that the firearm at issue affects commerce.

Moreover, the jurisdictional element of § 922(g)(1), which requires that the gun be possessed "in or affecting commerce" is virtually identical to the jurisdictional element of § 1202(a), which required that the gun be possessed "in commerce or affecting commerce." The *Lopez* Court evidenced approval of the constitutionality of § 1202(a) in its discussion of *Bass*, and no significant distinction between the jurisdictional elements of § 1202(a) and § 922(g)(1) exists. *See Turner*, 77 F.3d at 889 ("While the *Bass* court did not decide the constitutionality of § 1202(a), the citation of *Bass* in *Lopez* strongly implies that the jurisdictional element was sufficient.") Thus, under the very language of *Lopez*, § 922(g)(1) is constitu-

tional on its face, and Chesney's facial challenge must fail.

██ The presence of a jurisdictional element in § 922(g)(1) is important for several reasons under the *Lopez* framework. *Lopez* establishes "three broad categories of activity that Congress may regulate under its commerce power." —— U.S. at ——, 115 S.Ct. at 1629. The third category "includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Id.* at ——, 115 S.Ct. at 1629–30 (citations omitted).[2] In explaining "that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," the Court stated that two factors are relevant to determine whether a statute falls within this third category. As the Court wrote, "First, we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." *Id.* at ——, 115 S.Ct. at 1630 (citing, *inter alia*, *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)). It is at this point that the Court noted that § 922(q), the statute in question in *Lopez*,

> is a criminal statute *that by its terms has nothing to do with "commerce"* or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

political subdivision thereof of a felony ... and who receives, possesses, or transports in commerce or affecting commerce ... any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both. *See Scarborough v. United States*, 431 U.S. 563, 564, 97 S.Ct. 1963, 1964, 52 L.Ed.2d 582 (1977).

**2.** The other two *Lopez* categories, not relevant here, are regulations of "the use of the channels

of interstate commerce" and regulation and protection of "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." —— U.S. at ——, 115 S.Ct. at 1629.

*Id.* at ——, 115 S.Ct. at 1630–31 (emphasis added and footnote omitted). The Court then discussed a second factor: "Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1631. Next, the *Lopez* Court explicitly contrasted § 922(q) with § 1202(a), the statute in *Bass* that is now § 922(g)(1), the statute involved in Chesney's appeal.

Thus, the existence of a jurisdictional nexus in § 922(g)(1) is significant under both components of the third *Lopez* category. With respect to the first component, § 922(g)(1) contrasts directly with § 922(q) because § 922(g)(1) "by its terms" explicitly requires a relationship with commerce: § 922(g)(1) makes it unlawful for felons "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Chesney was charged with possession of a firearm in or affecting commerce. Not only was his possession directly linked to interstate commerce under the statutory language, but also the possession in or affecting commerce is directly linked by Congress as part of a statute prohibiting the related economic activities of interstate shipping, transporting, or receiving of firearms. In § 922(g)(1), Congress has prohibited possession of a firearm in or affecting commerce as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Thus, in complete contrast to § 922(q) in *Lopez,* § 922(g)(1) is a comprehensive statute regulating commerce in firearms by felons.

With respect to the second component, § 922(g)(1) clearly contains a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Numerous circuits, including our own, have upheld § 922(g)(1), focusing primarily on this factor. *See, e.g., Turner,* 77 F.3d at 889;

*Sorrentino,* 72 F.3d at 296; *Bell,* 70 F.3d at 498 ("to secure a conviction under § 922(g)(1) the government had to prove exactly what *Lopez* found missing under § 922(q)"); *Bolton,* 68 F.3d at 400; *Rankin,* 64 F.3d at 339; *Hanna,* 55 F.3d at 1462.

In accordance with the prior decisions of the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits, we conclude that § 922(g)(1) is constitutional on its face under the Commerce Clause analysis used by the Supreme Court in *Lopez.*

### C

■ Chesney, unlike the defendant in *Turner,* also challenges § 922(g)(1) as applied to him by arguing that his conviction is unconstitutional because the government failed to prove any "substantial nexus between the crime charged and interstate commerce." Chesney stipulated that the gun had moved in interstate commerce, and such a stipulation is sufficient evidence to support Chesney's conviction pursuant to § 922(g)(1). *See United States v. Lee,* 72 F.3d 55, 58 (7th Cir.1995) (stipulation that gun was in or affecting commerce sufficient evidence to support a conviction under § 922(g)(1)). Chesney argues, however, that *Lopez* requires the government to prove that Chesney's possession of the revolver in itself had a substantial connection to interstate commerce. Unfortunately, Chesney reads *Lopez* too broadly. *Lopez* did not disturb Supreme Court precedents such as *Perez v. United States,* 402 U.S. 146, 154–56, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), in which the Court held that Congress could regulate purely intrastate activities, as long as the activities affect interstate commerce. *See Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1629–30 (citing *Perez* ). *See also id.* at ——, 115 S.Ct. at 1637 (Kennedy, J. and O'Connor, J., concurring) ("[*Perez* ] and like authorities are within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today.") And *Lopez* also did not disturb the Supreme Court's precedents which indicate that a firearm that has been transported at any time in

interstate commerce has a sufficient effect on commerce to allow Congress to regulate the possession of that firearm pursuant to its Commerce Clause powers.

The Supreme Court has held that proof that a firearm moved in interstate commerce at any time is sufficient to meet the government's burden of proving the "in commerce or affecting commerce" element of § 1202(a), the predecessor to § 922(g)(1). *Scarborough v. United States,* 431 U.S. 563, 566–67, 97 S.Ct. 1963, 1964–65, 52 L.Ed.2d 582 (1977). Although *Scarborough* was decided as a matter of statutory construction, the Court noted that Congress knew how to assert " 'its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce,' " and that Congress intended to exercise the full extent of its Commerce Clause power when enacting § 1202(a). *Id.* at 571–72, 97 S.Ct. at 1967–68 (quoting *United States v. American Bldg. Maintenance Industries,* 422 U.S. 271, 280, 95 S.Ct. 2150, 2156, 45 L.Ed.2d 177 (1975)). The Court did not reach the issue of whether § 1202(a), as construed to reach possession of firearms that had moved at any time in interstate commerce, was within Congress's Commerce Clause power; however, the Court affirmed the conviction in *Scarborough.* The Court's silence on the constitutionality of the statute, coupled with the Court's language about Congress's intent to exercise its full Commerce Clause authority, indicates that the Court believed that § 1202(a) as construed, and thus § 922(g)(1), clearly was within Congress's power. The conclusion that § 922(g)(1) is constitutional is buttressed by the Supreme Court's decision in *Bass,* in which the Court construed § 1202(a) as requiring a nexus to commerce in part to avoid the constitutional question of whether punishment for mere possession of firearms by felons, without the commerce nexus, would be constitutionally permissible. *Bass,* 404 U.S. at 339 n. 4, 92 S.Ct. at 518 n. 4. The fact that the Court twice construed a statute to require only a minimum nexus with commerce, but did not discuss whether the statute as construed was constitutional, indicates that the Court clearly believed that the statute as construed was constitutional. It would be illogical indeed to infer a con-

trary result, particularly when the *Bass* Court construed the statute to avoid a constitutional question. When the Court construes a statute to avoid a constitutional question, the Court's construction must itself be constitutional. *See Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989) (court will avoid construction of statute that presents constitutional questions "if a reasonable alternative interpretation poses no constitutional questions"); *Communications Workers of America v. Beck,* 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988) (where doubts about a statute's constitutionality exist, the court will try to construe the statute "in a manner that renders it constitutionally valid").

All of the courts of appeals to consider the issue since *Lopez* have concluded that § 922(g)(1), as construed to require only the minimum nexus to commerce approved in *Scarborough,* is constitutional. *See, e.g., McAllister,* 77 F.3d at 390; *Sorrentino,* 72 F.3d at 296; *Shelton,* 66 F.3d at 992; *Hanna,* 55 F.3d at 1462 n. 2. As the Eleventh Circuit wrote in *McAllister,*

> In contrast to § 922(q), § 922(g) is an attempt to regulate guns that have a connection to interstate commerce; the statute explicitly requires such a connection. When viewed in the aggregate, a law prohibiting the possession of a gun by a felon stems the flow of guns in interstate commerce to criminals. Nothing in *Lopez* suggests that the "minimal nexus" test should be changed. Because the government demonstrated that the firearm possessed by McAllister previously had travelled in interstate commerce, the statute is not unconstitutional as applied to him.

*McAllister,* 77 F.3d at 390. We agree with these courts that Congress constitutionally may prohibit the possession by a felon of a firearm in or affecting commerce as part of a statutory framework prohibiting felons from interstate trafficking in firearms. Prohibiting possession by felons limits the market for firearms, and discourages shipping, transporting, and receiving firearms in or from interstate commerce. Regulation of interstate gun trafficking, which is clearly com-

mercial activity, is thus facilitated by regulation of possession in or affecting commerce. This satisfies both the spirit and language of *Lopez,* and can "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

Chesney's stipulation that the gun had been transported in interstate commerce was sufficient to meet § 922(g)(1)'s "in or affecting commerce" requirement. The fact that Chesney possessed a gun that previously had moved in interstate commerce provides a sufficient nexus between Chesney's conduct and interstate commerce to allow Congress to regulate Chesney's conduct pursuant to the Commerce Clause. Therefore, § 922(g)(1) is constitutional as applied to Chesney.

### III

Chesney also argues that the trial court erred by admitting evidence of the robbery that took place on June 5, 1992. In the June 5 robbery, Chesney used a gun identified as being similar to the one found in the car that Golden was driving. Chesney argues that the evidence of the June 5 robbery was inadmissible evidence of prior bad acts, and was so prejudicial as to be inadmissible under Fed.R.Evid. 403. The government argues that the evidence was admissible under Fed. R.Evid. 404(b) and under a "res gestae" theory—that the evidence was admissible to explain the possession crime.

■ Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, *knowledge,* identity, or absence of mistake or accident....

(emphasis added). To admit Rule 404(b) evidence, the district court must first determine as a matter of fact whether there is sufficient evidence that the prior act occurred. We review this factual determination under an abuse of discretion standard. Then the district court must determine as a matter of law whether the other act evidence is admissible as evidence of motive, intent, knowledge, or for some other lawful purpose. We review this legal determination de novo. Finally, the district court must determine whether the probative value of the other act evidence is outweighed by its unfairly prejudicial effect. We review this determination for an abuse of discretion. *United States v. Gessa,* 971 F.2d 1257, 1261–62 (6th Cir.1992) (en banc), *cert. denied after remand,* —— U.S. ——, 116 S.Ct. 827, 133 L.Ed.2d 769 (1996).

■ The district court's determination that there was sufficient evidence that the June 5 robbery occurred is not clearly erroneous. Chesney pleaded guilty to state robbery charges based on the June 5 incident before his federal trial on the felon in possession charge began.

■ The district court also was correct in its determination that the evidence of the June 5 robbery was admissible under Fed. R.Evid. 404(b) to show knowledge. The government was required to prove that Chesney knowingly possessed the gun in order to obtain a conviction under § 922(g)(1). *United States v. Hatfield,* 815 F.2d 1068, 1072 (6th Cir.1987) (government required to prove knowledge under predecessor statute to § 922(g)(1)); *United States v. Odom,* 13 F.3d 949, 961 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 116, 130 L.Ed.2d 62 (1994) (approving jury instruction on "knowledge element of the offenses" under § 922(g)(1) and 18 U.S.C. § 924(a)(2)). Chesney's knowledge was in issue in this case—in fact, whether Chesney knowingly possessed the gun found in the car was the *only* issue in this case because Chesney had stipulated to the other elements of the crime. Moreover, evidence of Chesney's knowledgeable possession was admissible because his knowledge was not inferable from the mere presence of the firearm in the car. *Hatfield,* 815 F.2d at 1072 (knowledge in issue when not inferable from the mere presence of firearm in van).

■ Finally, the district court did not abuse its discretion in determining that the probative value of the June 5 robbery evi-

dence significantly outweighed its prejudicial effect. The evidence of the June 5 robbery had substantial probative value. Evidence that a defendant used a firearm in a robbery five days before he was found in possession of a similar firearm would increase the likelihood that the defendant knowingly possessed the similar firearm. The district court also gave a limiting instruction, cautioning the jury that it could use the evidence of Chesney's other acts only to determine whether he knowingly possessed the firearm on June 10. This limiting instruction lowered the prejudicial effect of the admission of the robbery evidence. *See United States v. Clemis*, 11 F.3d 597, 601 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1858, 128 L.Ed.2d 481 (1994) (noting that no abuse of discretion occurred in admitting Rule 404(b) evidence when appropriate cautionary instructions were given). Although the evidence of the June 5 robbery certainly is damaging to Chesney's case, we perceive no abuse of discretion in the district court's determination that its probative value outweighed its prejudicial effect in this context.

### IV

Chesney also claims that the district court's jury instructions were erroneous in two respects. First, Chesney claims that the district court should not have instructed the jury on joint possession because the instruction allegedly nullified the defense theory that the revolver belonged to Golden, not Chesney. Second, Chesney claims that the district court erred by refusing to give his proposed jury instruction on assessing the credibility of witnesses.

▪ We review the instructions given by a district court to determine " 'whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.' " *United States v. Buckley*, 934 F.2d 84, 87 (6th Cir.1991) (quoting *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir.1984)). We will reverse a conviction for failure to give a requested jury instruction only when:

(1) the requested instruction is a correct statement of the law;

(2) the requested instruction is not substantially covered by other delivered instructions; and

(3) the failure to give the instruction impairs the defendant's theory of the case.

*United States v. Carr*, 5 F.3d 986, 992 (6th Cir.1993).

▪ Chesney's claim that the district court erred by giving an instruction on joint possession is without merit. The district court instructed the jury on joint possession using Sixth Circuit Pattern Instruction 2.11, which states that two or more persons may share possession of an item, and that the law considers each of them to have legal possession of the item. The district court also gave an instruction requested by Chesney, which informed the jury that it could not rely on Chesney's proximity to the gun or his association with someone else who possessed the gun to find that Chesney knowingly possessed the gun. Chesney nonetheless argues that the jury should not have been instructed on joint possession at all. However, a joint possession instruction was applicable in this case, given that two people were riding in the car in which the gun was found, and the district court's instruction correctly states the law. Therefore, the district court's instruction on joint possession was not error, let alone reversible error.

▪ The district court's failure to give Chesney's requested instruction pertaining to the credibility of a particular witness likewise was not error. The district court gave a lengthy instruction on assessing the credibility of witnesses, which instruction included factors the jury could consider and how the jury should weigh those factors. On appeal, Chesney characterizes his requested instruction as being drawn from Sixth Circuit Pattern Instruction 1.07. Although Sixth Circuit Pattern Instruction 1.07 is a correct statement of the law, the credibility instruction given by the district court conveyed substantially the same information as contained in the pattern instruction. In fact, giving Chesney's requested instruction essentially would have duplicated portions of the instructions given by the district court. Therefore, the district court did not err by failing to give Chesney's requested instruction.

## V

■ In his final assignment of error, Chesney claims that the district court violated his Fifth Amendment right to a fair trial by refusing to permit him to argue to the jury about the punishment he would receive if convicted. Chesney relies on *United States v. Datcher*, 830 F.Supp. 411 (M.D.Tenn.1993), in which a district court permitted the defendant to inform the jury of his mandatory sentence to provide the jury with information upon which the jury could exercise its nullification power.

While the *Datcher* decision supports Chesney's argument, the *Datcher* decision is contrary to Supreme Court pronouncements on this issue. The Supreme Court has stated that, unless juries have roles in sentencing, such as in capital sentencing proceedings, juries should be instructed not to consider defendants' possible sentences during deliberations. "It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, —— U.S. ——, ——, 114 S.Ct. 2419, 2424, 129 L.Ed.2d 459 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975)). The *Shannon* Court went on to note that jurors generally are not informed of mandatory minimum or maximum sentences or instructed on probation, parole, and sentencing ranges for lesser included offenses. —— U.S. at ——, 114 S.Ct. at 2428. *See also United States v. Thigpen*, 4 F.3d 1573, 1578 n. 3 (11th Cir.1993) (en banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 2746, 129 L.Ed.2d 865 (1994) (stating that courts have "no duty" to inform juries of the consequences of their verdicts absent statutory requirements) (quoting *White v. United States*, 387 F.2d 367, 367–68 (5th Cir.1967)).

In Chesney's trial, the jury had no sentencing function, and no statute required that the jury be informed of the consequences of its verdict. Thus, argument about possible punishment in Chesney's case is foreclosed by well-settled precedent, and the district court did not err in refusing to permit Chesney to argue about his possible punishment.

## VI

Because § 922(g)(1) is constitutional, and because the district court did not err by admitting evidence of the June 5 robbery, in giving its jury instructions, and by refusing to allow Chesney to argue about his punishment to the jury, we **AFFIRM** Chesney's conviction and sentence.

BATCHELDER, Circuit Judge, concurring.

I concur in all parts of the majority's opinion. However, I concur in the result of Part II.B only because I believe that we are bound by this Circuit's recently published opinion of *United States v. Turner*, 77 F.3d 887, 889 (6th Cir.1996), to uphold 18 U.S.C. § 922(g)(1)[1] (Supp.1995) ("§ 922(g)(1)") against the charge that it lies outside the scope of Congress's authority "to regulate Commerce ... among the several States...." U.S. CONST., art. I, § 8, cl. 3. *See* 6th Cir. I.O.P. 22.4.1 (1991) ("Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel."). I concur in the result of Part II.C because I believe that if the statute is constitutional, Chesney's stipulation that the gun moved in interstate commerce likely suffices to permit application of the statute to him.

I write separately in this case to explain why I believe the result we reach today, like the result in *Turner*, does not square with the Supreme Court's recent decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In addition, I

---

**1.** 18 U.S.C. § 922(g)(1) provides that "It shall be unlawful for any person ... who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The case before us challenges § 922(g)(1) only insofar as it prohibits a convicted felon from possessing a firearm in or affecting commerce. The references to the statute, unless otherwise made clear in context, should be understood to refer only to the felon-in-possession aspect of the statute.

write separately to explain why, even if I could agree as a matter of principle with today's majority on the proper resolution of the Commerce Clause question presented by this case, I could not accept the majority's manner of dealing with Supreme Court precedent.

## I.

### A. What *Lopez* Said

I begin with *Lopez.* As the majority correctly notes, *Lopez* struck down the former 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V) (" § 922(q)"), the Gun Free School Zones Act of 1990,[2] as beyond Congress's Commerce Clause power. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1626. The Court began its analysis in that case by canvassing its Commerce Clause jurisprudence, and drew from that jurisprudence three "broad categories" of activity Congress is constitutionally authorized to regulate. As the Court explained:

> [W]e have identified three broad categories of activity that Congress may regulate under its commerce power.... First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce.

*Id.* at ——, 115 S.Ct. at 1629–30 (citations omitted).

The Court went on to determine that:

> § 922(q) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate

transportation of a commodity through the channels of interstate commerce; nor can § 922(q) be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce. Thus, if § 922(q) is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce.

*Id.* at ——, 115 S.Ct. at 1630.

With that background in mind, the Court considered Congress's power under the third category to enact § 922(q). *Id.* In holding § 922(q) an invalid exercise of Congress's power to regulate intrastate economic activity, the Court wrote:

> Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulation of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Id.* at ——, 115 S.Ct. at 1630–31.

I deduce from this language that a federal criminal statute must, in order to be sustained under the third category of Congress's commerce power, satisfy one of two threshold requirements. A federal criminal statute must either (1) by its terms have something to do with "commerce" or some sort of economic enterprise, or (2) be an essential part of a larger regulation of economic activity "in which the regulatory scheme could be undercut unless the intrastate activity were regulated."[3] If either (1) or (2) is satisfied, two

---

**2.** The Act forbade "any individual knowingly to possess a firearm at a place that [he] knows, or has reasonable cause to believe, is a school zone." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1626 (quoting § 922(q)).

**3.** As I understand it, then, Congress *can* regulate non-"commercial" or non-"economic" activity under the third category of its interstate com-

merce authority. But it can only do so where the non-"commercial" or non-"economic" regulation is, as *Lopez* explained, "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

additional inquiries must be made in order to determine whether a statute falls within the third category of activities Congress can regulate under its interstate commerce power.[4]

Because § 922(q) did not satisfy either of the threshold requirements, the *Lopez* Court struck that statute down as beyond Congress's power. Although this holding effectively resolved the issue before the Court, the Court, presumably for purposes of providing guidance in future cases in which one of the threshold requirements could be satisfied, mentioned the two additional inquiries that courts would have to make when ruling on the constitutionality of a federal criminal statute enacted under the Commerce Clause. One of these inquiries looks to the statute itself, while the other looks to the nature of the regulated activity.

First, the Court noted that § 922(q) contained no "jurisdictional element" that would "limit the reach of the statute to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at ——, 115 S.Ct. at 1631. And second, the Court examined whether possession of handguns in school zones could be said substantially to affect interstate commerce. *Id.* at ——, 115 S.Ct. at 1631–32. Reasoning that it could not, the Court rejected the government's contention that either the costs of violent crime associated with possession of firearms in school zones, or the adverse impact on the educational process caused by such firearm possessions, had a substantial effect on interstate commerce. *Id.* at ——, 115 S.Ct. at 1632. The Court rejected the government's contention because the government's theories went too far. As the Court put it: "[I]f we were to accept the Government's arguments, we are hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Id.*

## B. What *Lopez* Meant

The portion of the *Lopez* opinion dealing with the constitutionality of § 922(q) has caused a considerable degree of confusion. In my view, both courts and commentators have *mis* interpreted that portion of *Lopez* as establishing some sort of constitutional laundry list by which a federal criminal statute, such as § 922(q) or § 922(g)(1), should be judged. *See, e.g., United States v. Bishop,* 66 F.3d 569 (3d Cir.1995); Deborah Jones Merritt, *Commerce!,* 94 MICH. L. REV. 674, 692–713 (1995). Laboring under this misinterpretation, courts and commentators have (not surprisingly) concluded that a federal criminal statute which contains a jurisdictional element must withstand Commerce Clause attack. *See* Majority opinion at 568 (collecting authorities); *Turner,* 77 F.3d at 889; Louis H. Pollack, *Foreword,* 94 MICH. L. REV. 533, 553 (1995) (nexus requirement in a new Gun Free School Zones Act will "presumably" act as a "constitutional bumperguard when it comes to judgment"); Kelly G. Black, Note, *Removing Intrastate Lawsuits: The Affecting–Commerce Argument After United States v. Lopez,* 1995 B.Y.U. L. REV. 1103, 1130–31 (jurisdictional element ensures constitutionality under the Commerce Clause). I cannot agree. *See Bishop,* 66 F.3d at 596 (Becker, J., concurring, in part, and dissenting, in part).

*Lopez* held that § 922(q) was unconstitutional because it had by its own terms nothing to do with "commerce" or any sort of economic enterprise, *Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1630–31, and because it was not an essential part of a larger regulation of economic activity in which the regulatory scheme could be undercut unless the intrastate activity were regulated. *Id.* at ——, 115 S.Ct. at 1631. In light of this holding, it was not necessary—logically or otherwise—for the Court to go on to consider whether § 922(q) contained a jurisdictional element or whether possession of firearms in school zones substantially affected interstate commerce. If, as the Court explained, § 922(q) could not be sustained as a valid exercise of Congress's "third category" of commerce power,[5] it follows that the consti-

---

4. As I explain in more detail below, the two additional inquiries are whether the regulation contains a jurisdictional element and whether

the regulated activity substantially affects interstate commerce.

5. I note as a point of clarification, that as I read *Lopez*'s discussion of the Supreme Court's Com-

tutional result could have been no different even if: (a) § 922 had contained a jurisdictional element, or (b) possession of firearms in school zones had had a substantial effect on interstate commerce.

Although I do not dispute the fact that the *Lopez* Court addressed the jurisdictional element and substantial effects questions, I cannot agree with those who believe that the reason the Court did so was to enable lower courts to uphold a federal criminal statute, such as § 922(g)(1), under Congress's interstate commerce power merely because the statute contains a jurisdictional element.[6] Instead, *Lopez* addressed the jurisdictional element and substantial effects questions in order to establish the framework for analyzing future Commerce Clause cases in which the regulated activity, in contradistinction to § 922(q), could be considered "commercial," or, even where not itself "commercial," "commercial" by virtue of being essential to a larger regulation of economic activity. *Id.* at ——, 115 S.Ct. at 1631. When a congressionally-regulated activity fits either description, courts must additionally consider the jurisdictional element and "substantially affects" questions. But where it does not (as was the case with § 922(q)), the jurisdictional element and substantially affects questions are unnecessary. *See Bishop*, 66 F.3d at 591 (Becker, J., concurring, in part, and dissenting, in part) ("If the intrastate activity is commercial, the 'substantial effects' jurisprudence applies, allowing Congress to regulate the activity if it in aggregate substantially affects interstate commerce; otherwise, the doctrine is inapplicable and affords Congress no basis for regulation").

Accordingly, I would hold that *Lopez* requires us to analyze the issue presented by this case as follows.

1. **Does regulating the possession of firearms by convicted felons fall within any of the three categories of activity Congress can regulate under its commerce powers?**

*Lopez* instructs us that the first question we must address is whether § 922(g)(1) falls within any of the three categories of activity that Congress can regulate under its interstate commerce power. I would find that, like the statute involved in *Lopez*, § 922(g)(1) cannot be upheld under the first two categories of activity that Congress is authorized to regulate under that power. Section 922(g)(1) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of interstate commerce. Nor, for that matter, can § 922(g)(1) be justified as a regulation by which Congress sought to protect an instrumentality of, or a thing in, interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630. In short, because § 922(g)(1) clearly aims to criminalize the mere possession of firearms by convicted felons, *Scarborough v. United States*, 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977) ("[T]he purpose of Title VII was to proscribe mere possession but ... there was some concern about the constitutionality of such a statute"), if it is to be upheld as a valid exercise of Congress's commerce power, it must be under Congress's third category of Commerce Clause authority. I note in passing that the majority and I agree on this point.

merce Clause jurisprudence, the Court has confined the third category of activities that Congress may regulate pursuant to its interstate commerce power to "cases upholding regulation of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez*, —— U.S. at ——, ——, 115 S.Ct. at 1630, 1631.

6. Those who think otherwise must, sooner or later, answer the following questions. If a regulation of a class of intrastate activity cannot be sustained under the third category of Congress's commerce power, what possible difference could it make that individual instances of such intra-

state activity have some relation to interstate commerce? What impact, if any, does *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (finding that "[w]here the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class") have where the *class of regulated activities* is *beyond* the reach of federal power? Is it true, as the majority's reasoning implies, *see* majority opinion at 570–71 that even if the *class of regulated activities* is beyond Congress's interstate commerce power, Congress still can regulate individual instances of such activity under that power?

**2. Does § 922(g)(1) have anything to do with "commerce" or "commercial activity," or is it an essential part of a broader regulation of economic activity?**

Like the statute involved in *Lopez*, § 922(g)(1) is a criminal statute that has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. *See Lopez*, ⸺ U.S. at ⸺ ⸺, 115 S.Ct. at 1630–31. The possession of a firearm by a felon (like possession of a firearm in a school zone) is simply not itself commercial activity.

Neither is § 922(g)(1) "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at ⸺, 115 S.Ct. at 1631. Section 922(g)(1), in addition to prohibiting the possession of a firearm by a convicted felon, prohibits such felons from shipping or transporting firearms or ammunition in interstate commerce, as well as from receiving any firearm or ammunition that has been shipped in interstate commerce. Even assuming for argument's sake that such a prohibitory scheme constitutes a "regulation of economic activity," I would find that the statutory prohibition on firearm possessions by convicted felons is not an "essential part" of that scheme. Additionally, with the exception of certain rarified hypothetical instances in which an individual "possessed" a firearm in or affecting commerce without either shipping or transporting or receiving a firearm in interstate commerce, or vice versa, eliminating the possessory aspect of § 922(g)(1) from that statute would not undercut the regulatory purposes of those parts of § 922(g)(1) that would remain. *See Scarborough*, 431 U.S. at 575 n. 11, 97 S.Ct. at 1969 n. 11 (Congress intended no distinction between receipt and possession). On authority of *Lopez*, then, § 922(g)(1) cannot be sustained under those Supreme Court cases upholding regulation of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect interstate commerce. *See Lopez*, ⸺ U.S. at ⸺, 115 S.Ct. at 1631. In other words, § 922(g)(1) is unconstitutional.

The fact that § 922(g)(1) contains a jurisdictional element cannot, as today's majority (like the majority in *Turner*, 77 F.3d at 889) concludes, majority opinion at 568–69, 569–70, rescue § 922(g)(1) from constitutional attack. Because § 922(g)(1) is not itself a regulation of commercial activity, or even a regulation of non-economic activity that is essential to a broader regulation of economic activity, according to *Lopez*, we need not look to the statute to determine whether it contains a jurisdictional element. For the same reasons, we need not inquire whether the possession of firearms by convicted felons substantially affects interstate commerce.[7]

**C. The Majority's *Mis*reading Of *Lopez***

I am aware of no judicial opinion or academic commentary that has suggested precisely the reading of *Lopez* I have just set forth. To be sure, the caselaw and academic

---

7. In turning back Chesney's "as applied" challenge to § 922(g)(1), the majority finds that the government does not need to prove that Chesney's firearm possession substantially affected interstate commerce in order to sustain a conviction under that statute. Majority opinion at 570–71. In support of its view, the majority explains that *"Lopez* did not disturb Supreme Court precedents such as *Perez v. United States*, 402 U.S. 146, 154–56, 91 S.Ct. 1357, 1361–62, 28 L.Ed.2d 686 (1971), in which the Court held that Congress could regulate purely intrastate activities, as long as the activities affect interstate commerce." Majority opinion at 570 (citations omitted). I cannot agree with the majority's conclusion about what the government does or does not need to prove in order to sustain Chesney's conviction under § 922(g)(1), since, in my view, that statute is unconstitutional, and no conviction can properly be sustained thereunder. However, I draw attention to the majority's finding for a different reason, namely that it demonstrates the majority's unwillingness to acknowledge that *Lopez* did not leave Supreme Court precedents such as *Perez* undisturbed.

To the extent that *Perez* required only that the activity prohibited under the statute involved in that case (intrastate loan-sharking) have "an effect" on interstate commerce, *Perez* is no longer the law. While *Lopez* is certainly not a paragon of clarity on every point, it is indisputable that *Lopez* requires that an intrastate commercial activity must have a *substantial effect* upon interstate commerce in order to fall within Congress's interstate commerce authority. *Lopez*, ⸺ U.S. at ⸺, 115 S.Ct. at 1630.

More importantly, though, I draw attention to the majority's finding because I believe that the majority has ignored an important distinction between the nature of the statute involved in *Perez* and the nature of § 922(g)(1). The statute

commentary that *Lopez* has spawned more closely follows the approach of today's majority than it does mine. *See, e.g., Turner,* 77 F.3d at 889 (collecting authorities); *United States v. McAllister,* 77 F.3d 387 (11th Cir. 1996); *United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995); Merritt, *supra;* Pollack, *supra.*

In a sense, I can understand why the majority has reached the result it has. For the better part of this century, the Supreme Court has found no meaningful limits to Congress's power to regulate interstate commerce under the federal Constitution. I suspect that the majority is reluctant, therefore, to find that *Lopez* is more than an "aberration" or a small pause in the High Court's previously longstanding and steady trend toward turning Congress's enumerated power to regulate interstate commerce into a generalized police power. But there is still a difference between reading a case narrowly and reading a case so narrowly that it is reduced to a hollow shell.

The majority's conclusion relies largely on two sentences drawn from a single paragraph in the Supreme Court's *Lopez* opinion.[8] *See Compassion in Dying v. Washington,* 49 F.3d 586, 590 (9th Cir.1995) ("It is commonly accounted an error to lift sentences or even paragraphs out of one context and insert the abstracted thought into a wholly different context."), *rev'd,* 79 F.3d 790 (9th Cir.1996) (*en banc* ). The majority converts these two sentences into the core of a constitutional standard for measuring whether a federal criminal statute comports with

the Commerce Clause, and in the process, ignores the larger principles announced by *Lopez.*

The majority opinion holds that the jurisdictional nexus contained in § 922(g)(1) converts that statute into one that regulates a commercial activity. Majority opinion at 570. In what I suppose is merely dicta, the majority goes on to find that the regulation of firearm possessions by convicted felons is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Majority opinion at 570 (citing *Lopez,* — U.S. at —, 115 S.Ct. at 1631). I deal with each of these holdings in turn.

A statute that regulates non-commercial activity cannot be converted into a statute that regulates commercial activity by dint of clever legislative craftwork. But in holding that the inclusion of a jurisdictional element in § 922(g)(1) transforms that statute into a regulation of commercial activity,[9] majority opinion at 570, the majority reduces the *Lopez* analysis to a single question: Does a challenged statute contain a jurisdictional element? When the answer to this question is "yes," according to the majority, both *Lopez*'s "regulation of commercial activities" test and its "jurisdictional element" test are satisfied. *Id.* at 569–70.

Thus, the majority opinion embraces the theory that if the words "in or affecting commerce" appear in a federal statute, the required relationship with interstate com-

---

in *Perez,* as the *Lopez* Court noted, *see Lopez,* — U.S. at —, 115 S.Ct. at 1630, involved "economic activity," which § 922(g)(1) does not. Commentators may criticize (and have criticized) this distinction, asking whether it can really be one of constitutional magnitude. I suppose that, as judges, we can also criticize. But we cannot do what the majority has done, which is to ignore the law. We are bound by *Lopez* to adhere to the commercial/non-commercial distinction in judging the constitutionality of federal criminal statutes under the Commerce Clause. Because the majority opinion totally disregards this distinction, I concur only in the result that § 922(g)(1) is a valid exercise of Congress's interstate commerce powers, and only do that because I am bound to follow the already established precedent of this Circuit.

**8.** The two sentences from *Lopez* that the majority quotes are as follows:

Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.... Unlike the statute in *Bass* [§ 1202(a) ], § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

Majority opinion at 569 (quoting *Lopez,* — U.S. at —, 115 S.Ct. at 1631).

**9.** In resting its "commercial activities" analysis on the language of the jurisdictional element contained in § 922(g)(1), the majority opinion must implicitly concede that possession of a firearm itself is not a commercial (or economic—I use these terms interchangeably) activity.

merce is established. *Lopez* did not leave the doors open to such a theory. Nor did it permit Congress magically to produce a commercial activity (possession of a firearm "in or affecting commerce") out of a non-commercial one (possession of a firearm) by conferring a jurisdictional credential on the non-commercial activity.

In dicta, the majority rules that § 922(g)(1) is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Majority opinion at 570 (citing *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631). While the majority invokes the language of *Lopez* to the effect that a regulation of non-commercial activity may be sustained as a valid exercise of Congress's commerce power if it is "an essential part of a larger regulation of economic activity," *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631, the most that the majority opinion has established is that § 922(g)(1) is *a part*—albeit not *an essential part*—of "a larger regulation of economic activity," *see* majority opinion at 570, 571–72, or that it "facilitates" such regulation. *See id.* at 572. The majority does not explain why or how the elimination of the possessory offense from § 922(g) would undercut the purposes of that statute's larger regulatory scheme. Saying it does does not make it so.

Additionally, the majority opinion only briefly mentions that *Lopez* involved an inquiry into whether § 922(q) constituted a regulation of an intrastate activity which arose out of, or was connected with, a commercial transaction, *id.* at 569–70, 571–72, holding, in essence, that this inquiry is satisfied here by § 922(g)(1)'s jurisdictional element.

ment. The majority opinion does not address Congress's findings on the question whether possession of firearms by convicted felons has (or had) a *substantial* effect on interstate commerce,[10] or its findings on the question whether the numerous state laws prohibiting possession of handguns by convicted felons are (or were) inadequate to the task of such regulation. *See Lopez*, —— U.S. at —— & n. 3, 115 S.Ct. at 1631 & n. 3; *see also* Donald Regan, *How to Think About the Federal Commerce Power and Incidentally Rewrite United States v. Lopez*, 94 MICH. L. REV. 554, 555 (1995) (arguing that federal power under the Commerce Clause exists where and only where there is a special justification for it, and suggesting that the relevant question in measuring a federal law or program under the Commerce Clause is: "Is there some reason the federal government must be able to do this, some reason why we cannot leave the matter to the states?"). Consideration of these points and the principles on which they rest is necessary for the majority's own analysis. By reading *Lopez* as simply reaffirming the Court's previous, expansive Commerce Clause jurisprudence, the majority effectively holds that *Lopez* has done nothing to rein in Congress's interstate commerce power, save perhaps to establish some sort of empty, formalistic requirements with which Congress must comply in order to legislate under that power.[11] I, for one, am unprepared to reduce the Supreme Court's *Lopez* decision to an anachronism to be noted in passing but ignored. Congress's enumerated powers, like Supreme Court opinions setting forth their limits, are, in my view, to be taken seriously, *see Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and taking these matters seriously requires that we rule § 922(g)(1) unconstitutional.

---

10. The original federal felon-in-possession statute, 18 U.S.C. § 1202(a), was enacted by Congress in 1968, *see Scarborough*, 431 U.S. at 563–64, 97 S.Ct. at 1963–64, when Congress' interstate commerce power was at its apex. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261–62, 85 S.Ct. 348, 359–60, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 302–03, 85 S.Ct. 377, 382–83, 13 L.Ed.2d 290 (1964); *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), *overruled by National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled by Garcia v. San Antonio Metro-*

*politan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

11. *Lopez*, it is true, clarified that an activity that Congress might think of regulating must have a "substantial effect," and not just "an effect" on interstate commerce before Congress may regulate it. While this holding is surely more than merely symbolic, it was not, I think, anything more than a clarification of the "substantial effects" test that had been lurking in the Supreme Court's prior caselaw all along. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1630. Unlike the majority, I think that *Lopez* does much more than simply announce the type of effect that an intra-

## II.

Even if I were inclined to agree in principle with the main thrust of the majority's reading of *Lopez,* I could not agree with the manner in which the majority reasons that the Supreme Court has already effectively passed on the constitutionality of § 922(g)(1) under Congress's commerce power. To explain why this is so, I set forth, at length, what I find, methodologically, the most troubling portion of the majority's opinion:

The Supreme Court has held that proof that a firearm moved in interstate commerce at any time is sufficient to meet the government's burden of proving the "in commerce or affecting commerce" element of § 1202(a), the predecessor to § 922(g). *Scarborough v. United States,* 431 U.S. 563, 566–67, 97 S.Ct. 1963, 1964–65, 52 L.Ed.2d 582 (1977). Although *Scarborough* was decided as a matter of statutory construction, the Court noted that Congress knew how to assert " 'its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce,' " and that Congress intended to exercise the full extent of its Commerce Clause power when enacting § 1202(a). *Id.* at 571–72, 97 S.Ct. at 1967–68 (quoting *United States v. American Bldg. Maintenance Industries,* 422 U.S. 271, 280, 95 S.Ct. 2150, 2156, 45 L.Ed.2d 177 (1975)). The Court did not reach the issue of whether § 1202(a), as construed to reach possession of firearms that had moved at any time in interstate commerce, was within Congress's Commerce Clause power; however, the Court affirmed the conviction in *Scarborough.* The Court's silence on the constitutionality of the statute, coupled with the Court's language about Congress's intent to exercise its full Commerce Clause authority, indicates that the Court believed that § 1202(a) as construed, and thus § 922(g), clearly was within Congress's power. The conclusion that § 922(g) is constitutional is buttressed by the Supreme Court's decision in *Bass,* in which the Court construed § 1202(a) as

state activity must have upon interstate commerce before Congress may regulate it under its "third category" of Commerce Clause authority.

requiring a nexus to commerce in part to avoid the constitutional question of whether punishment for mere possession of firearmsby felons, without the commerce nexus, would be constitutionally permissible. *Bass,* 404 U.S. at 339 n. 4, 92 S.Ct. at 518 n. 4. The fact that the Court twice construed a statute to require only a minimum nexus with commerce, but did not discuss whether the statute as construed was constitutional, indicates that the Court clearly believed that the statute as construed was constitutional. It would be illogical indeed to infer a contrary result, particularly when the *Bass* Court construed the statute to avoid a constitutional question. When the Court construes a statute to avoid a constitutional question, the Court's construction must itself be constitutional.

Majority opinion at 570–71 (other citations omitted).

I know of no basis in our jurisprudence permitting us to rely upon the Supreme Court's silence on a matter of constitutional significance as any indication, much less a "clear" indication, that the Court has, in effect, already passed upon a constitutional question. I have always understood the constitutional limitations imposed upon the judiciary by Article III of the federal Constitution to preclude us from rendering advisory opinions of the sort the majority attributes to the Supreme Court.

Conceding that the Commerce Clause pedigree of § 1202(a) may be relevant to the interpretation of § 922(g)(1), I simply cannot agree that the Court has ever even purported to rule on the constitutionality of § 1202(a)—much less the constitutionality of § 922(g)(1). Indeed, in *Bass,* a case on which the majority opinion heavily relies for its conclusion, the Supreme Court expressly reserved the question—a point which did not escape the *Lopez* Court. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631 (citing *Bass,* 404 U.S. at 339 n. 4, 92 S.Ct. at 518 n. 4; *United States v. Five Gambling Devices,* 346 U.S. 441, 448, 74 S.Ct. 190, 194, 98 L.Ed. 179 (1953) ("The principle is old and deeply im-

*Lopez* presages a return to the day when the Congress's interstate commerce authority had meaningful limits.

bedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative")). I am at a loss to understand how the majority opinion can rely upon the Court's silence about the constitutionality of § 1202(a) to hold that "it would be illogical indeed" to think that § 922(g)(1) is not a valid exercise of Congress's commerce power. *See United States v. Mitchell,* 271 U.S. 9, 14, 46 S.Ct. 418, 419–20, 70 L.Ed. 799 (1926) ("It is not to be thought that a question not raised by counsel or discussed in the opinion of the court has been decided merely because it existed in the record and might have been raised and considered.")

But for the fact that I am compelled to follow the established law of this Circuit, as handed down in *Turner, supra,* I would not concur in the majority's conclusion that § 922(g)(1) is a valid exercise of Congress's Commerce Clause authority. I, therefore, concur only in the result that § 922(g)(1) must be upheld and that Chesney's conviction must be sustained.