**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Cyril T. HANNA, Defendant–Appellant.**

**No. 94–10131.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 1995.

Decided May 31, 1995.

As Amended on Denial of Rehearing Aug. 9, 1995.

---

Shana Keating, V. Roy Lefcourt, San Francisco, CA, for defendant-appellant.

Martha Boersch, Asst. U.S. Atty., San Francisco, CA, for plaintiff-appellee.

Before: SNEED, SCHROEDER, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Cyril T. Hanna appeals his jury conviction and sentence for unlawful possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Hanna contends his conviction should be reversed because the government failed to produce (1) the grand jury testimony of the arresting officer, and (2) pretrial statements made by that officer that may have been inconsistent with his trial testimony. As grounds for his contentions, Hanna relied on (1) the Jencks Act, 18 U.S.C., § 3500(e)(3); (2) *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (3) his pretrial discovery request. Hanna argues also that 18 U.S.C. § 922(g)(1) is unconstitutional both on its face and as applied to him, and that his sentence must be reversed because the district court erred in calculating his criminal history points. We have jurisdiction under 28 U.S.C. § 1291, and we vacate Hanna's conviction and remand to the district court for a determination of whether the government failed to disclose any impeachment evidence which could have

been used to impeach the primary government witness.[1]

## I

Hanna's conviction was based primarily on the testimony of the arresting officer Kitt Crenshaw. As the government admitted during oral argument, the credibility of Sgt. Crenshaw was the key issue in the case. The trouble leading to this appeal resulted from a significant discrepancy between Sgt. Crenshaw's testimony and the police report he filed after arresting Hanna. Crenshaw stated in the police report:

KNOWING THAT HANNA WAS WANTED IN CONNECTION WITH AN ATT. MURDER CASE, I DETAINED HIM FOR INVESTIGATION. I CUFFED HANNA BEHIND HIS BACK, WHILE DOING SO I FELT AN OBJECT IN HIS BACK PANT AREA.

I RADIOED FOR ASSISTANCE, OFF. HENRY # 789 ARRIVED, I REMOVED THE OBJECT WHICH I DISCOVERED TO BE A SKI MASK, INSIDE THE SKI MASK WAS (E.1) PISTOL, LOADED WITH (4) LIVE ROUNDS, WITH ONE IN THE CHAMBER.

At trial, however, Sgt. Crenshaw testified to a different sequence of events leading to the discovery of the gun. The differences between his testimony and his report are such as to suggest strongly that the report was deliberately written in a self-serving fashion to obscure precisely when, where, and how Sgt. Crenshaw took the pistol from Hanna.

According to this new version, Sgt. Crenshaw only performed a "real light cursory search" as he was handcuffing Hanna. Although during this search Sgt. Crenshaw felt a bulge in the back of Hanna's shirt in the area of his waist, he did not suspect it was a weapon. A transportation van arrived within a matter of minutes and Hanna was placed inside the unit without being thoroughly searched. Sgt. Crenshaw testified that after they had travelled a few blocks, he noticed Hanna perspiring and moving around as though he were trying to conceal something. Sgt. Crenshaw ordered the van to stop and

entered the rear of the van to check on Hanna. Only then did he discover concealed on Hanna's person a Raven .25 caliber semiautomatic pistol wrapped in a ski mask.

Prior to trial, Hanna filed a motion for discovery requesting the production of, among other things: (1) "any statement, whether oral or written, made by any individual whom the government intends to call as a witness for trial, which is inconsistent with the witness' anticipated testimony;" (2) "[a]ll statements made by any witness for the government in this case—'Jencks Act' Statements;" (3) "[a]ll information in whatever form, source or nature which is favorable to the defense ... through potential impeachment of governmental witnesses or contradiction of government evidence;" and (4) "the disclosure of grand jury testimony ... [including] testimony of key witnesses who are critical to the government's case." Hanna's theory of defense at trial was that the pistol was never in his possession and that he was being framed by Sgt. Crenshaw.

## II

### Jencks Act Material

Hanna contends the government failed to produce prior to trial the grand jury testimony and other statements of Sgt. Crenshaw, in violation of the Jencks Act, 18 U.S.C. § 3500(e)(3). We need not reach the merits of this claim because Hanna did not properly raise it before the district court.

The Jencks Act provides in pertinent part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection *until said witness has testified on direct examination* in the trial of the case.

(b) *After* a witness called by the United States has testified on direct examination, the court shall, *on motion of the defendant,* order the United States to produce any statement (as hereinafter defined) of the

---

1. We order the unsealing of the grand jury testimony of Debra Dios and its disclosure to counsel for the defendant.

witness in the possession of the United States which relates to the subject matter as to which the witness testified. . . .

. . . .

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

. . . .

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500 (emphasis added).

■■■ Production of statements covered by the Jencks Act, however, is not automatic. *United States v. Wallace,* 848 F.2d 1464, 1470 (9th Cir.1988). In *United States v. Burke,* this Court stated:

> *[T]he burden rests upon the defendant* to invoke the statute at the appropriate time. . . . "No ritual of words" is required, but the defendant must plainly tender to the Court the question of the producibility of the document *at a time when it is possible for the Court to order it produced,* or to make an appropriate inquiry. If he fails to do so he may not assert, on appeal, that failure to order production or to undertake further inquiry was error. . . . The responsibility for fairly directing the attention of the Court to the precise demand submitted for the Court's determination is appropriately placed upon the Defendant, who seeks the statute's benefits.

*United States v. Burke,* 506 F.2d 1165, 1168 (9th Cir.1974) (quoting *Ogden v. United States,* 303 F.2d 724, 733 (9th Cir.1962), *cert. denied,* 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964)) (emphasis added), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975); *see also United States v. Moody,* 778 F.2d 1380, 1384 (9th Cir.1985), *amended,* 791 F.2d 707 (9th Cir.1986) ("[B]ecause 'the defendants failed to urge the asserted error at a time when the court could have made the necessary correction, the contention comes too late on appeal to show reversible error.' ").

Hanna's only request for the production of Jencks Act materials was made in a pretrial motion for discovery. Hanna did not move for the production of grand jury testimony or other witness statements after any of the government witnesses testified. Because Hanna failed to "tender to the Court the question of [Sgt. Crenshaw's statements or prior testimony] at a time when it [was] possible for the Court to order it produced," he may not claim, on appeal, that the failure to produce any such material violated the Jencks Act.

Moreover, we know now from the transcript of the grand jury proceedings, ordered by us to be produced at oral argument, that Sgt. Crenshaw did not testify before that body. The information from him on which the grand jury relied was presented in hearsay form by Special Agent Dios.

### III

### Brady Material

■■■ Hanna contends the prosecution committed reversible error by failing to produce *Brady* material. *Brady* material is any evidence material either to guilt or punishment which is favorable to the accused, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). A prosecutor's duty to reveal such evidence does not depend on a request by the defense. *United States v. Bagley,* 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985); *Thomas v. Goldsmith,* 979 F.2d 746, 749–50 (9th Cir.1992). The *Brady* rule encompasses impeachment evidence as well as exculpatory evidence. *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380. Prior statements of a witness that are both material and inconsistent with his anticipated testimony fall within the *Brady* rule. *Kyles v. Whitley,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (U.S.1995). We review de novo challenges to a conviction based on alleged *Brady* violations. *United States v. Woodley,* 9 F.3d 774, 777 (9th Cir.1993).

■■■ We are concerned by the obvious discrepancies between the police report filed by Sgt. Crenshaw and his testimony at trial; and we are mindful that a police report recording the events surrounding the arrest of a citizen is an important official document required to be accurate, and not misleading.

Special Agent Debra Dios of the Bureau of Alcohol, Tobacco, and Firearms was the sole witness before the grand jury. She affirmed

that her testimony was "based on [her] own personal knowledge and investigation as well as information [she had] learned from other people." She did not say who these "other people" were. Her testimony regarding the events surrounding Hanna's arrest was consistent with Sgt. Crenshaw's police report but arguably inconsistent with his trial testimony. Dios said, "Knowing [that a warrant existed for his arrest,] Sergeant Crenshaw placed Hanna under arrest at that time. During the search *incident to the arrest,* Sergeant Crenshaw located in the small of Hanna's back a ski mask with a 25-caliber automatic inside the ski mask." (Emphasis added.) Dios made the same statement in an affidavit attached to the complaint filed in district court. Because "incident to the arrest" has a technical meaning suggesting in this case that the gun was found and seized *before* Hanna was placed in the van, Dios's testimony (as well as what she said in her affidavit) is inconsistent with Sgt. Crenshaw's testimony.

What the record does not reveal is whether Special Agent Dios acquired the information regarding Hanna's arrest from reading the police report or from personally speaking with Sgt. Crenshaw. If Special Agent Dios did speak with Sgt. Crenshaw, the prosecution might be hard-pressed to show that the conversation did not include inconsistent statements made by him, considering the significant differences between Sgt. Crenshaw's police report and subsequent trial testimony. For example, if he told her the full story, what he said was inconsistent with his report. If he told her the obfuscated version, what he said was inconsistent with his trial testimony. The long and the short of it is that we don't know what he said to her, *if anything.* But, if he *misled Dios,* or for that matter the prosecutor, such an act would reflect on his credibility. As the Supreme Court has recently noted, "When the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Kyles,* — U.S. at —, n. 15, 115 S.Ct. at 1572, n. 15.

We are unable to discern from the record exactly when and how Sgt. Crenshaw revealed to the government the full story of his seizure of Hanna's pistol. We believe this to be a situation, however, where the government should be required affirmatively to demonstrate whether it discharged its obligation under *Brady* to provide the defense with impeachment evidence within the government's possession. *See United States v. Bernal–Obeso,* 989 F.2d 331, 333 (9th Cir. 1993).

Moreover, we note that during discovery Hanna explicitly requested from the government any inconsistent statements made by its main witness. Considering the apparent contradictions between Sgt. Crenshaw's police report and trial testimony, the government's cursory statement that it produced all *Brady* material and all inconsistent statements in its possession is not sufficient in light of the government's lack of knowledge as to the source of Dios's belief that the seizure was "incident to the arrest."

We do not suggest that the government engaged in any bad-faith conduct or even that it failed to fulfill its obligations under *Brady.* Possibly, Dios never even discussed the seizure with Sgt. Crenshaw in which case our remand might be for naught. And, Sgt. Crenshaw's explanation on the witness stand of his behavior is not implausible—even though his combative defense in court of his report is less than convincing when measured against his testimonial admissions (1) that his failure to thoroughly search Hanna before putting him in the van violated San Francisco Police Department policy, and (2) that he turned over the disputed report to his Lieutenant for approval. At this point, one can only wonder what he may have told the Lieutenant.

We do not suggest that any conceivable person acting on the government's behalf is deemed someone the government must seek out and interview, or that an evidentiary hearing will routinely be necessary to determine whether the government has contacted witnesses remote from the investigation or whether such witnesses possess exculpatory material. Here, however, concrete evidence exists in the record that San Francisco Police Department policy required officers to search prisoners immediately before placing

them in a transportation vehicle, and that Sgt. Crenshaw submitted his report of this incident to his Lieutenant for approval. These facts, combined with the obvious discrepancies between Sgt. Crenshaw's report and his trial testimony, the substance of which the prosecutor presumably knew prior to trial, make it likely that the prosecutor knew that Sgt. Crenshaw may have made statements to his Lieutenant; and therefore, the government should have inquired about them.

Accordingly, as we stated in *Bernal–Obeso,* "resolution of this matter is best served by the light of a hearing, not the darkness of an assumption on appeal." *Id.* As the history of Kyles's case demonstrates, an evidentiary hearing is a good device to ensure that a court's decisions are based on fact, not supposition.

That the prosecutor might not have been aware of any inconsistencies between Sgt. Crenshaw's testimony and any conversation with Agent Dios or his Lieutenant is irrelevant. As the Supreme Court said in *Kyles,*

> [T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that *the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf· in the case, including the police.* But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady,* 373 U.S., at 87 [83 S.Ct., at 1197]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles,* —— U.S. at ——–——, 115 S.Ct. at 1567–68 (emphasis added). Such an obligation flows naturally and directly from Justice Sutherland's admonition in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), that a prosecutor's interest is "not that it shall win a case, but that justice shall be done."

We realize that the differences between the report and Crenshaw's testimony were aired during the trial, but if it turns out that Crenshaw misled Dios, as he may have tried

in his report to mislead his department and his Lieutenant, the district court shall determine based on fact and not speculation whether such evidence—if any—"could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at ——, 115 S.Ct. at 1558.

## IV

### Sentencing

The district court added three points each for Hanna's convictions for assault with a deadly weapon with great bodily injury and for carrying a concealed weapon in calculating Hanna's criminal history points. Hanna contends this determination was in error because these two cases were consolidated for sentencing under U.S.S.G. § 4A1.2 Application Note 3.

Application Note 3 states in part: "Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (*i.e.,* the defendant is arrested for the first offense prior to committing the second offense)." Construing Application Note 3, this Court has stated:

> In determining whether cases are related, the first question is always whether the underlying offenses were punctuated by an intervening arrest; by the logic and ordering of Note 3, that inquiry is preliminary to any consideration of consolidated sentencing.... Properly read, Note 3 instructs that whenever offenses are separated by intervening arrests, the sentences for those offenses are unrelated regardless of whether sentencing was consolidated.

*United States v. Gallegos–Gonzalez,* 3 F.3d 325, 327 (9th Cir.1993).

The Presentence Report indicates that Hanna was arrested for assault with a deadly weapon on June 3, 1988, but was not arrested for carrying a concealed weapon until August 8, 1988. Therefore, the district court correctly treated the two offenses separately in calculating Hanna's criminal history.

## V

### 18 U.S.C. § 922(g)(1)

Lastly, Hanna argues 18 U.S.C. § 922(g)(1) is unconstitutional both on its

face and as applied to Hanna. These arguments are meritless.

■ In *Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), the United States Supreme Court concluded that 18 U.S.C. app. § 1202(a), the predecessor of § 922(g)(1), required only "the minimal nexus that the firearm have been, at some time, in interstate commerce." *Id.* at 575, 97 S.Ct. at 1969.

The Ninth Circuit has applied the Supreme Court's holding in *Scarborough* to § 922(g)(1), stating:

> As the Supreme Court noted in discussing section 1202(a), "Congress sought to reach possessions broadly, with little concern for when the nexus with commerce occurred." *Scarborough,* 431 U.S. at 577 [97 S.Ct. at 1970]. In amalgamating sections 922(g), 922(h), and 1202(a), Congress gave no indication that it meant to narrow the statutory reach with respect to possession. Accordingly, we hold that the *Scarborough* minimal nexus standard applies to section 922(g) and that a past connection is enough.

*United States v. Sherbondy,* 865 F.2d 996, 1000–01 (9th Cir.1988) (footnote omitted). Therefore, Hanna's contention that 18 U.S.C. § 922(g)(1) is facially unconstitutional must fail.[2]

■ The serial number of the gun confiscated from Hanna in San Francisco revealed it had been stolen in Sparks, Nevada. This history is sufficient to establish a past connection between the gun and interstate commerce. *Sherbondy,* 865 F.2d at 1001. Therefore, § 922(g)(1) is not unconstitutional as applied to Hanna.

### VI

### Conclusion

Because we cannot discern from the record whether the government fulfilled its obligation under *Brady* to produce all material impeachment evidence, we vacate Hanna's conviction and remand this case to the district court with instructions to conduct an

evidentiary hearing to determine whether Sgt. Crenshaw made any other statements during the course of the investigation which qualify as *Brady* material. Prior to this hearing, the government shall discharge its *Kyles* obligation (1) to inquire of Agent Dios and Sgt. Crenshaw's Lieutenant regarding the existence of any statements made by the witness that are inconsistent with his testimony, and (2) to deliver any such information to Hanna's attorney and the district court. If the district court determines that the government, including in this case the San Francisco Police Department, had no favorable evidence to turn over, or that any evidence withheld was not such as to create "'a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different,'" *Woodley,* 9 F.3d at 777 (quoting *Bagley* 473 U.S. at 682, 105 S.Ct. at 3383), the court may reinstate the judgment of conviction, *see United States v. Kiser,* 716 F.2d 1268, 1274 (9th Cir.1983). This panel retains appellate jurisdiction over this matter.

VACATED and REMANDED.

---

2. We have read and considered *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), holding 18 U.S.C. § 922(q) to be unconstitutional on Commerce Clause grounds, but it does not alter our analysis. The Supreme Court distinguished § 922(q) from 18 U.S.C. app. § 1202(a), the predecessor of § 922(g), stating "§ 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1625. Section 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its constitutionality under the Commerce Clause.