UNITED STATES of America, Plaintiff–Appellee,

v.

Dennis Charles MACK, Defendant–Appellant.

No. 97–50364.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1998.

Decided Jan. 12, 1999.

Don B. Kates (Argued), Benenson & Kates, Novato, California, and C.D. Michel (On the Briefs), Michel & Associates, Los Angeles, California, for the defendant-appellant.

Patrick J. Walsh, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: REINHARDT, TROTT, and T.G. NELSON, Circuit Judges.

## OPINION

TROTT, Circuit Judge:

### OVERVIEW

This case is about contraband firearms outlawed by Congress and targeted for confiscation and destruction, and who can and cannot possess them once seized by a law enforcement agency.

Dennis Charles Mack, a private citizen, challenges his convictions for unlawful possession of sawed-off shotguns and rifles in violation of 26 U.S.C. § 5861(d), and posses-

sion of handguns with obliterated serial numbers in violation of 18 U.S.C. § 922(k). He argues that because he intended to destroy the weapons as an agent of the local law enforcement agencies from which he obtained them, he is exempt from punishment under the statutes. Mack also challenges the constitutionality of the statutes under which he was convicted. He argues that the statutes: (1) exceed Congress's power to legislate under the Commerce Clause; (2) violate the Second Amendment; and (3) interfere with the sovereignty of the states. Mack also claims that he received ineffective assistance of counsel. Finally, Mack argues that the district court erred by refusing to instruct the jury on the defenses of entrapment by estoppel and reliance on public authority. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS

From 1982 to 1996, Defendant–Appellant Dennis Charles Mack was a federally licensed private firearms dealer who owned several gun shops in the Los Angeles area. As early as 1992, Mack contacted local police departments and offered to dispose of illegal weapons the police had seized in exchange for the ability to keep and sell the legal weapons they had confiscated. In 1994, Mack told William Thompson, the property control officer for the Kern County Sheriff's Department, that his federal license authorized him to possess and to destroy illegal National Firearms Act registry weapons (NFA weapons).[1] When the prosecutor asked Thompson, "What did Mr. Mack tell you [in 1994] about his federal firearms license?," Thompson's answer was, "He indicated that he could take our guns, that it was no problem for him to take the guns, both the salable guns and guns that we had for destruction also."[2] As a result of Mack's solicitations, various local law enforcement agencies entrusted him with numerous illegal weapons with the expectation that the weapons would be destroyed.[3]

On September 21, 1994, Inspector Ramiro Wong of the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF) inspected Mack's premises and found ten illegal NFA weapons. Wong conducted this inspection on information from an apprehensive gun dealer hired by a bankruptcy trustee appointed to inventory the guns in the defendant's shop. Upon discovering the weapons, Wong told Mack that he was not authorized to possess NFA weapons. Mack replied that he was allowed to possess the contraband because he was an agent of the police departments from which he had obtained them so that they could be destroyed. Wong informed Mack that he was mistaken. Wong explained to Mack that he was simply a private person and that he was not allowed to possess NFA weapons.

1. The NFA requires sawed-off shotguns to be registered with the Bureau of Alcohol, Tobacco, and Firearms, in the National Firearms Registry. *See* 26 U.S.C. § 5861(d).

2. Our respected dissenting colleague's attempt to undercut this testimony is not valid. Although he claims he is taking Thompson's testimony "as a whole," his presentation of it inappropriately fuses and blurs two separate conversations between Mack and Thompson, the first held in person at a gun show, and the second held days later over the telephone. A fair reading of the testimony reveals that Mack did not contradict or withdraw over the phone what he told Thompson in person, and he did not deny at trial that he told Thompson that his federal license authorized him to possess and to destroy NFA weapons. Mack's oblique explanation that his statements to Thompson were "out of context" is an admission that he made them.

3. With all respect to our colleague, his dissent misrepresents whose idea it was in the first place for Mack to take and to destroy these weapons.

Reading the first two paragraphs of the dissent would falsely lead a reader to assume that the police agencies actively sought Mack out for this task when in fact it was the other way around-Mack approached them. The implication of the dissent's fanciful presentation, of course, is that it was "unfair" for the federal government to prosecute a person recruited and misled by local police; but that is not this case. The facts as developed in trial demonstrate otherwise.

For a real example of the hypothetical case suggested by our colleague, the reader might care to examine *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976). In *Barker*, low-level Watergate conspirators were absolved of criminal responsibility because they relied on "authoritative pronouncements of officials whose decisions we wish to see respected." *Id.* at 947. For an excellent discussion of the exculpatory effect of certain mistakes of law, see Professor George Fletcher's "Rethinking Criminal Law" (1978).

Wong himself could not confiscate the weapons because he was not authorized to do so.

Wong returned to Mack's shop for another inspection in January 1995, and discovered that Mack had not heeded his warning. Mack was still in possession of the NFA weapons. Wong informed Mack for a second time that he was not allowed to possess NFA weapons. As he had before, Mack replied that he could possess the weapons because he was an agent of the police and that he still intended to destroy the weapons on their behalf.

On February 7, 1995, Wong returned to Mack's shop and issued Mack a Report of Violations for possessing NFA firearms. The report ordered Mack to refrain from taking possession of NFA firearms and to abandon all NFA firearms currently in his possession to the ATF or to the local police departments from which he had received them. Mack signed the report.

Despite Wong's oral and written warnings, Mack continued to receive more NFA firearms from local law enforcement agencies, including the Kern County Sheriff's Department and the Huntington Police Department. In July 1995, an ATF special agent went to Mack's shop and confiscated ten sawed-off shotguns. The special agent again informed Mack that he could not legally possess NFA weapons.

After Mack's Federal Firearm's License was revoked at the recommendation of Inspector Wong, Mack called ATF Deputy General Counsel Daniel Cronin to discuss his agency theory. Cronin also told Mack that he could not possess the weapons.

In November 1995, Mack sought renewal of his federal firearm's license, but he sent in the renewal form three days late. The ATF has authority under 18 U.S.C. § 923(g) to conduct compliance inspections on federally licensed gun shops without consent. However, the ATF must ask for consent to inspect gun shops when an applicant is applying for a new license. After Inspector Wong reviewed Mack's late request for renewal, Wong contacted Cronin to discuss how the consent issue should be handled on a late renewal request. Cronin and Wong agreed that Wong must get Mack's consent to inspect because the renewal was late.

On November 21, 1995, Wong went to Mack's shop to discuss the firearm's license renewal. With Mack's acquiescence, Wong inspected Mack's gun shop and discovered more than 60 NFA firearms. After the inspection, Wong and Cronin again discussed the inspection, and Wong informed Cronin that he had asked for and received Mack's consent to inspect the premises. Wong returned seven days later to inventory the firearms.

On December 14, 1995, ATF agents searched Mack's gun shop pursuant to a search warrant based on Wong's November inspection information. The government seized the 63 NFA firearms that form the basis of the indictment in this case. The firearms appeared to be randomly stored at various unsecured locations in his shop.

After the seizure, Mack again called William Thompson. Thompson had previously released over 200 guns from the Kern County Sheriff's Department to Mack for off-site destruction based on Mack's misleading representation about the scope of his federal license. Mack asked Thompson to send him a letter stating that Mack was an agent of Kern County. Thompson told Mack that his department did not have agents and that he did not have the authority to write such a letter.

Subsequently, Mack was indicted on charges of possession of unregistered firearms in violation of 26 U.S.C. §§ 5861(d) and 5872, and possession of firearms with obliterated serial numbers in violation of 18 U.S.C. § 922(k). Mack moved to suppress the seized guns based on his allegation that Wong did not ask for consent to inspect in November.

At the suppression hearing, Mack testified that Wong told him that Wong was there to do a compliance inspection. Mack testified that he believed that under those circumstances he had no choice but to allow Wong to inspect his gun shop. Wong testified that he was conducting an application inspection and that he had asked for Mack's consent before inspecting the gun shop. The district

court concluded that the issue of consent turned on credibility. Finding that Mack had consented to the search, the court found Wong's testimony to be more credible than Mack's. The court denied the motion to suppress.

In a pretrial ruling on a motion in limine, the district court ordered excluded all evidence designed to establish that Mack was a duly authorized agent of any state or local law enforcement agency that entrusted him with the contraband weapons. The court accepted the prosecutor's argument on behalf of the government, that only *federal* law enforcement agencies could authorize such possession. Accordingly, the court told Mack's counsel, "you can introduce evidence of what Mr. Mack was told by the federal officers, but as far as the state officers are concerned, no." The district court also said, correctly we believe, that "it doesn't matter whether the local police appointed [Mack] as an agent."

Consistent with these rulings, the district court refused Mack's request to instruct the jury that if it found that Mack possessed the weapons on behalf of and with the authorization of a local police agency for the purpose of destroying the firearms, he was not guilty of the offense charged.

The jury found Mack guilty on all charges. On June 27, 1997, he was sentenced to 15 months in prison, three years supervised release, and a fine of $12,500.00. Mack challenges his convictions on appeal.

### STANDARD OF REVIEW

■ We review the district court's interpretation of a statute de novo. *Tierney v. Kupers,* 128 F.3d 1310, 1311 (9th Cir.1997). A claim of insufficient evidence is reviewed in the light most favorable to the government to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Randolph,* 93 F.3d 656, 660 (9th Cir.1996). A claim for ineffective assistance of counsel is reviewed de novo. *United States v. Benlian,* 63 F.3d 824, 826 (9th Cir.1995). We review the constitutionality of a statute de novo. *United States v. Hicks,*

103 F.3d 837, 847 (9th Cir.1996). A district court's refusal to give a jury instruction requested by the defense that is based on a question of law is reviewed de novo. *United States v. Eshkol,* 108 F.3d 1025, 1028 (9th Cir.1997).

### DISCUSSION

#### A. Applicability of the Statutes

■ Mack contends based on an agency theory that the terms "receive" and "possess" in 26 U.S.C. § 5861(d) and 18 U.S.C. § 922(k) do not include the acts of private citizens receiving or possessing weapons from local law enforcement agencies in order to destroy them. He argues that the application of the statutes to this type of conduct would undermine and contradict long-established federal gun control policy that fosters and supports state-based gun control laws. Thus, Mack does not contest that he knowingly possessed or received the weapons at issue. Instead, he contends that the conditions under which he obtained and then exercised dominion and control over them exempts him from punishment under the statutes. We conclude, however, that Mack's conduct is not exempt from the prohibitions of 26 U.S.C. § 5861(d) and 18 U.S.C. § 922(k).

The plain language of the statutes indicate that they apply to *any person.* Title 26 U.S.C. § 5861(d) states:

> It shall be unlawful for *any person* ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.

26 U.S.C. § 5861(d) (emphasis added). Similarly, 18 U.S.C. § 922(k) provides in relevant part:

> It shall be unlawful for *any person* ... to possess or receive any firearm which has had the ... serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(k) (emphasis added).

■ There is a "strong presumption that the plain language of [a] statute expresses congressional intent." *Ardestani v. INS,*

502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (quotation and citation omitted). The presumption "is rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed." *Id.* at 135–36, 112 S.Ct. 515 (quotation and citations omitted). We can find no indication that Congress clearly expressed a contrary intent other than that found in the plain language of the statute. Therefore, "we are bound to take Congress at its word." *Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 118 S.Ct. 838, 841, 139 L.Ed.2d 849 (1998).

In response to this construction of these statutes, Mack claims that such a literal approach will cause havoc to rain down upon the normal operations of local police agencies. He foresees

> mischievous and absurd consequences: local police may still be able to confiscate illegal firearms, but they will no longer be able to store them in property rooms run by civilian custodians.

He also argues that law enforcement agencies, prosecutors, and defense counsel will be precluded from having firearms examined by independent laboratories; and that the Alpine County California Sheriff's Department will be unable "to ship such a firearm via UPS to the state forensic laboratory in California for examination."

Even if some of Mack's parade of imponderables were to come to pass, however, such consequences of a sweeping law against deadly weapons used primarily by robbers and other violent criminals are best addressed by the legislative branch of government, not by us. It is common knowledge that the primary purpose of shortening a shotgun or a rifle under the permitted length is to make it concealable and thus effective in the commission of serious crimes such as bank robbery, murder, drug trafficking, and gang violence. The same purpose attaches also to the obliteration of serial numbers on handguns: The act of obliteration makes

them harder to trace. Congress surely is within its power when it acts decisively to protect the nation from such weapons, and to ensure that once they are seized, they do not immediately leak again into commerce or the private sector.

More to the point, however, the law has long recognized that the reach of a strictly-constructed statute stops short of nonsensical consequences. The Supreme Court has recognized that a statute shall be construed to exempt the government if application of the statute to the government would create an absurdity. *See Nardone v. United States,* 302 U.S. 379, 383–84, 58 S.Ct. 275, 82 L.Ed. 314 (1937). The statutes at issue here would create an absurd situation if any duly authorized employee of a state or local law enforcement agency could be punished for possessing confiscated weapons in the scope and course of the employee's duty. Neither statute expressly includes the government within their prohibitions. Thus, we conclude that local law enforcement agencies and their employees are able, without running afoul of the statutes, to possess the prohibited weapons in order generally to enforce the law, to prosecute defendants, and to destroy the weapons.[4]

Mack's conduct does not fit within *Nardone*'s governmental exception. Mack was expressly and accurately warned by federal authorities on more than one occasion that he was not allowed to possess the contraband weapons. His federal license did not confer upon him the power to do so. Moreover, he was unable to show that *any* local law enforcement agency considered him to be its employee for one simple reason: he wasn't. When the evidence is viewed even in the light most favorable to him, at best he was a self-appointed private interloper who steadfastly created a false impression as to the scope of his authority in connection with his federal license. He came into possession of the weapons by misleading the police.

---

**4.** We note the common practice of using private contractors to melt down these weapons in a smelter in the presence and under the direction and control of officers present at the scene. The mere circumstantial handling of such weapons under the immediate direction of state or government employees by private persons would not amount under the law either to receiving or possessing the weapons. Such episodic handling lacks the required dominion and control required to satisfy these elements of the statute.

The facts of this case sharply illustrate the wisdom of Congress' purpose strictly to control the handling of dangerous weapons identified as contraband and to cause them to be confiscated and destroyed. To allow state or local law enforcement agencies to deliver unsupervised possession of such weapons into the hands of non-agency persons is tantamount to permitting the seized weapons to be released once more into the private world from which they were taken. To permit the release from government control of contraband once seized-be it cocaine, heroin, child pornography, knock-off "Rolex" watches, or anthrax-would be a senseless act. Practically speaking, once these weapons were under Mack's dominion and control, he had the raw power to do with these weapons whatever suited his fancy. The special attributes of government agencies that justify their regulated possession of contraband are nowhere to be found in this set of disquieting facts, either in Mack's perishable license or his sometimes bankrupt business. In fact, according to his own testimony, his previous store was invaded at least twice by burglars and robbers in 1992 resulting in the loss to the invaders of "a lot of merchandise." One doubts that robbers and burglars would destroy the NFA weapons as required by law. Moreover, Mack's claim that his guiding purpose was to destroy the weapons is undercut by his desuetude in so doing. Under these circumstances, our dissenting colleague's anguished cries of "federal prosecutorial power run amok" strike a false note.

The jury had substantial evidence on which to convict him under both statutes of exercising dominion and control over the prohibited firearms.

## B. Ineffective Assistance of Counsel

■ Mack contends that he received ineffective assistance of counsel, claiming that his attorney failed adequately to impugn the credibility of ATF Inspector Wong. At trial, however, Mack's counsel made the arguments that Mack now alleges were essential to his case. Additionally, his counsel thoroughly cross-examined Wong regarding the issue of consent. Thus, we conclude that the performance of Mack's counsel's was adequate under *Strickland v. Washington*, 466 U.S. 668, 687–90, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## C. Constitutionality of the Statutes

■ Mack contends that 26 U.S.C. § 5861(d) and 18 U.S.C. § 922(k) are unconstitutional because: (1) the statutes interfere with the sovereignty of the states in light of *Printz v. United States*, 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); (2) Congress exceeded its Commerce Clause power by passing the statutes; and (3) the statutes violate the Second Amendment right to bear arms. We disagree.

The statutes may require accommodation by state officials, but they do not interfere with the sovereignty of the states. Unlike the statute at issue in *Printz*, sections 5861(d) and 922(k) do not press state officials into federal service. Therefore, we conclude that *Printz* simply does not apply in this case.

■ Mack also argues that under *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the statutes at issue in this case exceed Congress's Commerce Clause power. We conclude, however, that Congress did not exceed its power by passing the statutes. We have already determined that the passage of § 5861(d) was a permissible exercise of Congress's taxing power. *See United States v. Tous*, 461 F.2d 656, 657 (9th Cir.1972) (per curiam). Thus, the statute is not vulnerable to a Commerce Clause challenge. Further, after *Lopez*, in *United States v. Hanna*, 55 F.3d 1456, 1462 n. 2 (9th Cir.1995), we held that the requirement under § 922(g) that a firearm was, at some time, in interstate commerce is sufficient to establish a statute's constitutionality under the Commerce Clause. Section 922(k) has a requirement identical to the requirement of the statute in issue in *Hanna*. Section 922(k) makes it unlawful to possess or receive a firearm with the serial number altered if it has been shipped or transported in interstate of foreign commerce. 18 U.S.C. § 922(k). Thus, we conclude that the prohibitions of § 922(k) do not exceed Congress's Commerce Clause authority to legislate.

Mack also contends that the statutes violate his Second Amendment right "to keep and bear arms." U.S. Const. amend. II. This court has clearly held, however, that private citizens do not have standing to bring a Second Amendment challenge. *See Hickman v. Block*, 81 F.3d 98, 101 (9th Cir.1996).

## D. Entrapment by Estoppel and Public Authority Defense

Mack claims the trial judge erred by refusing to instruct the jury on the defenses of entrapment by estoppel and reliance on a public authority. These claims are without merit because Mack did not rely on the advice or authority of *federal* officials or agents. *See United States v. Collins*, 61 F.3d 1379, 1385 (9th Cir.1995) (holding that a defendant arguing entrapment by estoppel against a federal statute must have relied on federal official's or agent's erroneous advice); *and see United States v. Burrows*, 36 F.3d 875, 882 (9th Cir.1994) (holding the same for the public authority defense).

## CONCLUSION

Based on the foregoing analysis, we affirm Mack's convictions under 26 U.S.C. § 5861(d) and 18 U.S.C. § 922(k).

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

## I.

We have before us a case of federal prosecutorial power run amok. This time, the target is a most unusual one. After sweeping aside the rights and interests of local law enforcement agencies in conducting their business in a manner they deem appropriate and efficient, the majority upholds the conviction of a citizen who did no more than act in accordance with the lawful instructions of several local police and sheriffs departments, and, at their request, perform a non-law enforcement function on their behalf. In doing so, the majority condones not only the violation of the rights of an individual but a serious intrusion on the independence of local law enforcement agencies.

Dennis Mack is a licensed gun dealer who is now serving 15 months in a federal prison. His crime was carrying out a function duly assigned to him by local law enforcement agencies, and performed for their convenience and benefit. On behalf of, and at the behest of these agencies, Mack took possession of illegal firearms that they had seized in order to destroy them, as the agencies were required to do. Mack's defense to this bizarre prosecution has remained consistent from his pre-trial motions through his appeal to this court. He has contended that his possession of the prohibited weapons was not illegal because he was acting on behalf of local law enforcement agencies, at their lawful request. He is correct, both as a matter of fact and law. The laws of the United States do not criminalize such innocent and constructive conduct, and Mr. Mack was convicted of a crime he did not commit.

In its opinion, the majority correctly holds that there is no violation of either 26 U.S.C. § 5861(d) or 19 U.S.C. § 922(k) when a "duly authorized employee" of a local law enforcement agency is given prohibited firearms by a local agency for the purpose of destroying them, although the statutes appear on their face to prohibit giving such arms to any person. The problem arises because the majority's interpretation of the statutes is arbitrarily limited and stops short of the only reasonable construction: when *any* duly authorized person—be he a "duly authorized employee," a "duly authorized agent," or a "duly authorized contractor"—is given weapons by a local police department in order to destroy them, the person's possession of the weapons for that purpose is not unlawful. Indeed, this reasonable construction of the statutes is precisely the one given them by the head of the Bureau of Alcohol, Tobacco, and Firearms—the federal agency responsible for their enforcement. Why the majority believes that a "duly authorized employee," an ordinary non-uniformed individual employed by a law enforcement agency, may possess these weapons, but a duly authorized private contractor or agent whose services have been specifically retained by the agency for that purpose, and who is himself licensed to handle firearms, may not, we are left to wonder.

There is nothing in the statute that requires the anomalous result the majority reaches. Rather, it is only the majority's policy disagreement with the Director of the ATF, John Magaw, as to whether local agencies should be free to use the services of outside persons to destroy weapons that causes it to reach the decision it does. Because there is absolutely nothing in the statutory language that supports the majority's construction, because there is nothing in that language that permits agencies to use civilian employees but not civilian agents or independent contractors, and because the ATF's interpretation of the statutes is reasonable and the majority's is not, I would adopt the Director's construction and reverse Mack's conviction.

The evidence in this case is undisputed that Mack was given the firearms by local law enforcement agencies, *as their agent,* in order to destroy the weapons. In a series of erroneous evidentiary rulings, however, the district court excluded the most favorable and direct testimony on this point; it also approved a set of erroneous jury instructions that prohibited Mack from relying on his one and only defense, an absolutely proper one: that he was duly authorized to possess the weapons for purposes of destruction. All of the district court's critical rulings were premised on a theory of the law that is entirely incorrect: the district court ruled that only the *federal* government may authorize a person or entity to take possession of prohibited firearms in order to destroy them. I, like the Director of the ATF, understand the statute to allow local law enforcement agencies to do so as well, at least in instances in which they lawfully come into possession of illegal weapons that they intend to destroy.

Even though the evidence was undisputed that Mack was lawfully given the weapons by local law enforcement agencies so that he could destroy them on their behalf, the jury was told by the district judge that they could not acquit him on that basis. This despite the fact that, as the Director of the ATF reports, possession for purposes of destruction by an authorized agent of a local law enforcement agency is not a crime.

The majority opinion is in error in two fundamental respects. First, refusing to accept the uncontroverted fact that Mack's possession of the weapons was explicitly authorized by local police departments, the majority seriously misstates the circumstances of this case. Second, the majority's construction of the statutes is arbitrary and departs, for no good reason, from the logical construction given them by the ATF.

II.

The majority incorrectly describes Mack's relationship with the local law enforcement agencies on whose behalf he possessed the weapons. According to the majority, "[w]hen the evidence is viewed even in the light most favorable to [Mack], at best he was a self-appointed private interloper who steadfastly created a false impression as to the scope of his authority in connection with his federal license. He came into possession of the weapons by misleading the police." (Opinion at 255). A review of the record shows that this statement is at best misleading and at worst plainly incorrect.[1]

1. In footnote three, the majority contends that Mack sought out the weapons destruction work from the local police departments, and that this dissent implies falsely that the departments sought him out. For starters, this distinction is wholly irrelevant. It matters not one whit to the outcome of this case whether Mack offered his services to the police agencies or whether the agencies found him on their own initiative. The important point is that Mack performed the services at the request of and on behalf of the local police and sheriffs' departments. The theory of the prosecution and the district judge, erroneous as it turns out to have been, was that the local police agencies lacked the authority to · retain

Mack's services. Whether or not he had a federal firearms license—and he did—could not matter less. Moreover, as shown below, Mack was prevented from introducing evidence as to his relations with police agencies generally, including any questions as to how he obtained the business. Each time he sought to establish the nature of his relationship with local law enforcement agencies, (except for one minor slip) the district court held the testimony irrelevant. Thus, it is most unfair of the majority to seize on bits of conversations regarding one particular relationship and create out of that a theory that neither party could have imagined was relevant to the outcome of the case, and indeed is not.

First, in no conceivable sense—let alone viewed in the light most favorable to Mack—does the evidence establish that Mack was a "self-appointed private interloper." Mack attempted throughout the trial to introduce evidence that he operated as an agent of a number of local police departments. His attempts to do so were rebuffed continuously by the district court, and accordingly, Mack was prevented from putting on most of the evidence that unequivocally demonstrated the nature of his relationship with the local agencies. For example, Mack testified that he had received a letter from one of the local police departments stating that "I appoint Dennis Mack my *agent* to transport and destroy these guns." (emphasis added). The district court had Mack's testimony stricken from the record. (TR 8/14/96 at 156). Mack also attempted to introduce a letter from the City of Ridgecrest police department—a department that had provided him with some of the guns that formed the basis of the indictment—regarding his relationship with that department. Again, the prosecutor objected, and again the district court refused to admit the evidence because it concluded that "it doesn't matter whether the police department *appointed him as an agent.*" (TR 8/15/96 at 3–7).

Despite the fact that Mack was almost completely prevented from introducing evidence in support of his contention that he was acting at the explicit request of the local departments, the evidence that was admitted makes it clear that he indeed was, and that he was without question far more than a "self-appointed private interloper." During cross-examination, William Thompson, the property control clerk of the Kern County Sheriff's Department, testified that the department regularly requested that Mack take possession of and then destroy the illegal firearms they seized. The following colloquy with Thompson illustrates the fact that Mack was not just a "self-appointed private interloper":

Defense Counsel: [W]hen you entered into a *business relationship* with Mr. Mack in 1994, that was for the destruction of guns at the Kern County Sheriff's Department.

Mr. Thompson: That's correct. . . .

Defense Counsel: And you entered into that agreement because it was beneficial for Kern County Sheriff's Department?

Mr. Thompson: Correct.

Defense Counsel: And during that—and in 1994, Mr. Mack came and helped Kern County destroy guns?

Mr. Thompson: That's true.

Defense Counsel: Under your supervision; is that correct?

Mr. Thompson: Correct.

(TR 8/15/96 at 60–62) (emphasis added). Mack initially destroyed guns for Kern County on the department's premises. When that proved too "mess[y]," however, Thompson testified that Mack was authorized to take the weapons off-site in order to destroy them. (TR 8/15/96 at 66–67).[2]

Second, Mack simply did not "steadfastly create[ ] a false impression as to the scope of his authority in connection with his federal license." The majority's statement that he did appears to amount to nothing more than an echo of the government's answering brief. The record certainly does not support such an assertion. As the majority's own exposition of the record makes clear, the *only* local police department official to testify on the question was Thompson. Thus, despite the fact that Mack dealt with numerous local agencies, only a single employee of a single agency said anything about Mack misrepresenting his federal license. From such limited evidence it is hard to understand how the majority concludes that any misrepresentation at all was steadfast.

Thompson's testimony taken as a whole was ambiguous. As the majority notes, Thompson was asked what Mack had said about his federal firearms license during a gun auction in 1994. According to Thomp-

---

**2.** Richard Golledge, the property custodian for the City of Shafter Police Department also testified that his department had given weapons to Mack to destroy. The defense introduced a copy of the official property record, kept by that police department, indicating one such transfer to Mack. (TR 8/14/96 at 83–89). There is no explanation of how this evidence crept into the record despite the court's ruling that such testimony was irrelevant and inadmissible.

son, Mack "indicated that he could take our guns, that it was no problem for him to take the guns." (TR 8/15/96 at 50). But the majority cites to only part of Thompson's testimony. When Thompson was asked about a later telephone conversation with Mack, he testified as follows:

Q [The Prosecutor]: [D]id he [Mack] tell you that he could take possession of your illegal firearms?

A [Thompson]: Yes, he did.

Q: And your sawed-off shotguns?

A: Yes, he did.

Q: And what was the basis for him being able to take those guns, if you know?

A: Well, he didn't indicate a basis other than he indicated that he could replace some of the illegal parts....

Q: Did he tell you on the phone that his federal firearms license allowed him to have these weapons?

A: He didn't specifically say that but, like I say, he indicated that it would not be a problem for him to take possession of them.

(RT 8/15/96 at 53). This testimony, given by a single property clerk from a single police department, simply does not support the majority's conclusion that Mack "steadfastly created a false impression" regarding the scope of that license.[3] Nor, accordingly, can it support the majority's conclusion that Mack "came into possession of the weapons by misleading the police." (Opinion at 255). More important, the fact is that Mack didn't need a license and, whether he had one or

not, and whether or not he told the police that one of his federal licenses would permit him to perform the services the local agencies desired, there was no legal bar to his taking possession of the weapons, which was all that mattered to the local agencies in the first place. *See infra* n. 3.

Despite the majority's suggestion to the contrary, the record in this case makes it clear that Mack possessed these weapons because local police departments gave them to him and requested that he destroy them on their behalf, and that he, therefore, possessed them lawfully. The evidence, moreover, does not show that Mack "steadfastly created a false impression" as to what his license entitled him to do, nor does it suggest that Mack misled the law enforcement agencies that gave him these weapons, or that it mattered whether Mack was wrong as to the scope of his federal licenses.[4]

### III.

Mack was convicted of illegally possessing firearms under two Federal firearms statutes, 26 U.S.C. § 5861(d) and 28 U.S.C. § 922(k). Both statutes make it unlawful for "any person" to possess the weapons described therein. As the majority states, a strict reading of the statutes would lead to the conclusion that *any* possession of prohibited firearms violates federal law. But, as the majority also states, a strict reading of the statutes produces an absurd result: if "any person" violates §§ 5861(d) and 922(k) when he "possesses" prohibited weapons,

---

**3.** No other witness testified that Mack had misrepresented the scope of his license. Mack himself was asked whether he told Thompson that he "had a federal firearms license that allowed [him] to take possession of N.F.A. weapons." (RT 8/14/96 at 164). Mack's reply was: "That's a little out of context." Mack went on to testify to his understanding that private gun dealers could destroy weapons without running afoul of the firearms statutes.

**4.** I point out the discrepancy between the majority's categorization of the evidence and the actual record because the majority's presentation of the facts presents a misleading impression of Mack's conduct. As I discuss below, however, the majority's contention that Mack misrepresented the effect of his federal firearms license is irrelevant. As John Magaw, the Director of the ATF has

made clear, local law enforcement agencies may authorize private citizens to destroy weapons on their behalf. No federal firearms license is necessary to do so. In a letter to Congressman David Dreier, Magaw clarified that the "ATF neither issues licenses nor regulates private firms in the business of destroying weapons." Thus, whatever Mack may have said about the scope of his federal license is immaterial. It is also irrelevant that Inspector Wong, a federal agent, told Mack that he could not possess the weapons. Wong, like the district judge, simply misunderstood what the Director of the agency made clear during the pendency of these proceedings: local law enforcement agencies may indeed authorize private individuals or entities to possess, for purposes of destruction, weapons that local agencies have seized.

then police officers employed by local police departments are guilty of federal firearms violations when they seize guns from felons and place them in their stations' lockers.

It is a well-settled canon of statutory construction that courts should not rely on the plain meaning of statutes when that reading would produce absurd results. *See, e.g., Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Perry v. Commerce Loan Co.,* 383 U.S. 392, 400, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966); *Seattle–First National Bank v. Conaway,* 98 F.3d 1195, 1197 (9th Cir.1996); *In re Pacific–Atlantic Trading Company,* 64 F.3d 1292, 1303 (9th Cir.1995). This rule applies to criminal statutes as well as civil ones. *See, e.g., Aponte v. Gomez,* 993 F.2d 705, 708 (9th Cir.1993).

Applying this rule, the majority properly concludes that "[t]he statutes at issue here would create an absurd situation if any duly authorized employee of a state or local law enforcement agency could be punished for possessing confiscated weapons in the scope and course of the employee's duty." (Opinion at 472). Any duly authorized employee, of course, includes both uniformed and civilian employees of such agencies. While the majority is correct that the statutes cannot reasonably be read to cover such employees, it is equally true that the statutes would create an "absurd situation" if read to provide that *any* person duly authorized by a local law enforcement agency—be he an "employee," "agent," or "contractor"—could be punished for possessing such weapons, when he possesses them at the request and with the explicit authorization of the agency. The only way to read these statutes so as to avoid absurd results is to hold that when local law enforcement agencies authorize private individuals or entities to take possession of prohibited firearms for the purpose of destroying them on behalf of the agency, such possession is not criminal.

This latter, slightly more expansive but far more plausible reading of the statutes, is also the interpretation offered by the head of the agency responsible for administering them. John Magaw, the Director of the Bureau of Alcohol, Tobacco and Firearms (ATF), in a letter to Representative David Dreier of California issued while this appeal was pending, stated unequivocally that "law enforcement agencies are allowed to enter into agreements with private sector firms to destroy illegal weapons." The ATF letter makes no artificial distinction between "employees" and other private individuals or entities duly hired or retained by the local agency to destroy prohibited weapons. What matters is whether or not the private party is *authorized* by the local department to possess and destroy the weapons. Whether this authorization takes the form of an employment contract, an agency relationship, or simply a verbal services agreement, is immaterial. An individual or entity authorized to possess the weapons by a local law enforcement agency may not be criminally liable for such possession.[5]

Had the majority correctly interpreted these statutes, it would have been forced to reverse Mack's conviction. This is so because the district court held that a private individual or entity's possession of prohibited weapons for purposes of destruction is illegal, *even when such possession is duly authorized by local police agencies,* and that only a federal agent can authorize private parties to possess illegal weapons for such purpose.[6]

---

**5.** In a rather cryptic footnote, the majority states that the common practice of "using private contractors to melt down these weapons in a smelter in the presence and under the direction and control of officers present at the scene" does not amount to a violation of the statutes. The footnote would seem to derive from the Magaw letter. Nowhere in that letter, however, does the ATF state that possession of prohibited weapons by private citizens for purposes of destruction is lawful only when the destruction is supervised by the local police. Although the ATF "recommends" such supervision, it is not required, and

the lack of supervision does not make the otherwise lawful possession illegal.

**6.** Of course, under the majority's construction of the statute local law enforcement agencies *could* lawfully authorize a private individual to possess prohibited weapons in order to destroy them, but only if it made that individual an employee. Why local authorities can authorize a private person to possess prohibited weapons by extending temporary or permanent employment to that individual, but can't authorize that same individual's possession of the weapons by any other contractual means, is left unexplained.

All of the evidence presented at trial, to the extent that it was admitted, showed that Mack received the weapons from local police and sheriffs departments, and that he was authorized by local law enforcement officers to destroy the weapons on their behalf. Moreover, as noted above, most of the evidence Mack sought to introduce regarding the existence of specific agency relationships between local law enforcement departments and himself was excluded because the district court ruled that "it doesn't matter whether the police appointed [Mack] as an agent." (TR 8/15/96 at 6).

Perhaps most significantly, the district court refused to instruct the jury that if it found that Mack possessed the weapons on behalf of and with the authorization of a local police agency for the purpose of destroying the firearms, he was not guilty of the offenses charged. Instead, the court instructed the jury that it could find Mack not guilty *only* if *federal* agents, rather than *local* law enforcement officers, authorized him to take possession of the weapons. Although the head of the federal agency charged with enforcing these statutes understands that local law enforcement agencies may authorize private citizens to possess weapons of the type involved here for purposes of destruction, the majority's contrary construction of the statutes leads it to find no error in the district court's outright refusal to instruct the jurors on this defense or in its giving the jury a directly contrary instruction.

## IV.

In conclusion, as the ATF has confirmed, Mack's construction of § 5861(d) and § 922(k) is correct. Contrary to what Inspector Wong thought, and what the majority holds today, the district court misconstrued the law when it held that the authorization by local law enforcement agencies of the defendant's possession of weapons for purposes of destruction is irrelevant to the legality of the possession. As a result of this misinterpretation, the district court made it impossible for the jury to grant Mack the acquittal to which he was entitled as a matter of law. It excluded most of the exculpatory evidence he sought to introduce and then told the jurors in its instructions that they could convict him despite the fact that he had committed no offense.

The majority's decision to uphold Mack's conviction is based on the fact that Mack was not an "employee" of a local law enforcement agency. The majority fails to explain, however, where in the statute it finds the distinction, on which its holding is based—the distinction between civilians employed by local police departments and civilians whose services are obtained by those departments through other contractual means. The majority also fails to offer persuasive reasons for rejecting the broader construction of the statutes offered by the head of the ATF—a construction that clearly and sensibly exempts not only "employees" but other authorized persons.

The majority also appears bothered by two irrelevant facts. First, Mack told Thompson that his federal firearms license covered his work of destroying weapons. The fact is, as the head of the ATF has stated, that no federal firearms license is necessary for that work. Second, Mack failed to follow the legal interpretation of the firearms statute that Inspector Wong, an ATF employee, persistently put forth. Wong was wrong, however—as the head of his agency, the ATF, has stated.

Because the majority misinterprets the statutes, and because Mack violated no federal law, I respectfully dissent. I would reverse Mack's conviction and free him forthwith.