BEA, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority’s result, based on its analysis of the issues presented in this case, as applied to this case only.[1] The government failed to follow either the procedures of United States v. Tamura, 694 F.2d 591 (9th Cir.1982), or those outlined in the approved warrant, which would have required the government to conduct its search of the seized intermingled computer files by using computer technicians not case investigators.
Further, I would affirm the Cooper, Mahan, and Illston orders because the seized names at issue were not in “plain view” when seized. The plain view doctrine requires evidence of illegality to be “immediately apparent” to the searching investigator. Horton v. California, 496 U.S. 128, 139-140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Here, the portion of the spreadsheet (located within the “Tracey” directory) that contained the drug testing results, contained both the names of the ten ballplayers who were the subjects of the warrant and the names of many other ballplayers, the records of whom the government did not have probable cause to search and seize. The spreadsheet did not, however, initially display on the agent’s computer screen the results of steroid testing as to the other ballplayers. To see the spreadsheet col *1181 umn containing the results of the tests of the other ballplayers, the agent had to scroll to his right on the spreadsheet, onto another screen. However, once he scrolled to the right, the agent could see not only the testing results for the targeted ten, but also the results for all of the other ballplayers whose results were listed on the spreadsheet.
A valid “plain view” seizure of items that are truly “immediately apparent” would have required the agent to display only the testing results for the ballplayers for whom he had a warrant, and seize only evidence of additional illegality if such evidence is “immediately apparent” as part of the segregated results for those ballplayers. For instance, the agent could have selected the spreadsheet rows for the ten ballplayers for whom he had a warrant, then copied and pasted those rows into a blank spreadsheet.[2] If he had done so, he would have seen only those drug testing results for which he had a warrant.
However, as the government conceded at oral argument before Judge Mahan, rather than limiting the scope of his search in any way, or seizing only that evidence of illegality “immediately apparent” on the first screen he called up, Agent Novitsky intentionally and volitionally scrolled right on the spreadsheet, without first having segregated only the responsive data, “to see if there was anything above and beyond that which was authorized for seizure in the initial warrant.” This demonstrates the seized evidence of illegality was not “immediately apparent” or in “plain view.”
Thus, I agree with the majority and vote to affirm the district courts’ orders. I write separately, however, because the majority’s opinion goes beyond the current ease or controversy in two respects.
I.
The majority affirms the Mahan Order finding Judge Mahan did not abuse his discretion in deciding the evidence seized by the government must be sequestered and returned because the balance of the equities favored Comprehensive Drug Testing. With that portion of the opinion, I concur. The majority holds further, as an alternative ground on which to affirm Judge Mahan’s order, that the fact that the government deliberately disregarded the terms of the search warrant when it executed its search compelled Judge Ma *1182 han to order the sequestration and return of the evidence. Majority Op. at 1174. I cannot concur with that alternative ground because it is unnecessary to the majority’s decision; our court should affirm only on the ground Judge Mahan correctly balanced the equities.
Furthermore, the rule that the government’s deliberate disregard of the terms of a search warrant is by itself sufficient to order the return of evidence is unnecessarily broad. Under Ramsden v. United States, whether the government acted in willful disregard of the limits of a search warrant is just one factor in a four factor analysis. 2 F.3d 322, 325 (9th Cir.1993). The majority transforms that one factor of the balancing test into a dispositive issue. See Majority Op. at 1174-75. The Rams-den factors have been sufficient to govern motions for the return of property for nearly two decades and the majority does not explain the rationale for modifying that rule in this case.
There may be cases where the government did show willful disregard of the terms of the search warrant, but the motion for the return of evidence should nonetheless be denied. For example, when a movant cannot prove he will be irreparably harmed if the seized property is not returned — the second element of the Ramsden inquiry — then it seems the district court should not return the evidence merely because the government obtained the evidence through intentional wrongdoing. An example would be images of child pornography, which is always “contraband,” possession of which is criminal. See United States v. Mack, 164 F.3d 467, 473 (9th Cir.1999). Instead, the district court should balance the equities to determine whether sequestration and return of the evidence is necessary, based on the specific facts of the case presented.
II.
The majority affirms because Judge 111-ston did not abuse her discretion in quashing the subpoenas sought by the government after the Cooper and Mahan Orders were filed. I agree and would affirm on that ground as well.
The majority then holds that whenever the government seeks a subpoena, it “must fully disclose to each judicial officer prior efforts in other judicial fora to obtain the same or related information, and what those efforts have achieved.” Majority Op. at 1175. Although I imagine such disclosure is generally a good practice for the government to follow, I do not see why such a practice should have the force of law. If it is good policy, its adoption should be decided by Congress or the Executive as the policy-making branches of our government. This new requirement is simply not necessary to the decision.
The majority supports this new requirement by stating: “This is no more than we require of, for example, a prisoner seeking to file a second or successive habeas petition.” Id. This analogy to habeas petitions does not hold up to scrutiny. Congress enacted the requirement that habeas petitioners disclose their prior petitions so the burden on the courts of excessive petitions would be lightened. See 28 U.S.C. § 2244(b)(3)(A) (Revision Notes and Legislative Reports, 1948 Acts). Here, the majority imposes a similar requirement to protect owners of property and defendants in criminal cases, not to improve judicial efficiency.
III.
Finally, I do not join Chief Judge Kozinski’s concurrence because it is advisory and unnecessary to the current case and controversy. It would be nice to give magistrates clear “guidance” when possi *1183 ble. But that is true in all cases, and yet we still approach that goal by issuing rulings on the cases and controversies properly before us, and nothing more.

. I agree, however, with Judge Callahan and Judge Ikuta that the later-filed Cooper Order does not have preclusive effect on the earlier-filed Mahan Order. That said, the majority reaches the correct result in this case even if the Cooper order is not given preclusive effect.

. The record reveals the spreadsheet was in Microsoft Excel format. Agent Novitsky viewed the spreadsheet on or about April 8, 2004. By that time, Microsoft Excel was the most widely used spreadsheet application available for Microsoft Windows and Mac OS X operating systems. See http://en.wikipedia. org/wiki/Microsoft_Excel. Microsoft Excel became commercially available in 1985, and currently sells for $229 retail. See http:// office.microsoft.com/en-us/excel/FX 102464391033.aspx.
In Microsoft Excel, to avoid scrolling to the right and viewing the results column for all of the ballplayers instead of just for the targeted ten, all Agent Novitsky had to do was the following: While depressing and holding the Control key, he would click on the numbers on the left side of the spreadsheet that corresponded to the rows that contain the names of the targeted ballplayers. The rows containing those ballplayers' names would become highlighted. Novitsky would then release the Control key. He would next go to the top of the screen, click on the "Edit” menu, and choose "Copy.” Then, he would click on the "File” menu at the top of the screen, and choose "New Blank Workbook.” When the new blank spread-sheet appeared on the screen, he would click on the “Edit” menu in the new blank spreadsheet and choose "Paste.” The rows of the ten targeted ballplayers selected in the original spreadsheet and only those rows — would appear in the new spreadsheet. Novitsky would then scroll to the right in the new blank spreadsheet and would see only the test results for the targeted ballplayers for whom he had probable cause to search and seize.